**Scott HUMINSKI, Plaintiff–Appellant–Cross–Appellee,**

v.

**Hon. Nancy CORSONES, Hon. M. Patricia Zimmerman, Karen Predom, Defendants–Appellees–Cross–Appellants,**

**Sheriff R.J. Elrick and Rutland County Sheriff's Department, Defendants–Appellees.**

**Docket Nos. 02–6201(L), 02–6150(XAP), 02–6199(CON), 03–6059(CON).**

United States Court of Appeals, Second Circuit.

Argued: Oct. 20, 2003.

Decided: Oct. 7, 2004.

Robert Corn–Revere, Davis Wright Tremaine, LLP (Ronald G. London, Robert B. Mahini, and Constance M. Pendleton, of counsel), Washington, DC, for Plaintiff–Appellant.

Shannon A. Bertrand, Reiber, Kenlan, Schwiebert & Facey, P.C., Rutland, VT, for Defendants–Appellees–Cross–Appellants Hon. Nancy Corsones and Hon. M. Patricia Zimmerman.

Joseph L. Winn, Assistant Attorney General of the State of Vermont (William H. Sorrell, Attorney General of the State of Vermont), Montpelier, VT, for Defendant–Appellee–Cross–Appellant Karen Predom.

Pietro J. Lynn, Lynn & Associates, P.C., Burlington, VT, for Defendants–Appellees Sheriff R.J. Elrick and Rutland County Sheriff's Department.

J. Joshua Wheeler (Robert M. O'Neil, of counsel), Charlottesville, VA, for Amicus Curiae The Thomas Jefferson Center for the Protection of Free Expression.

Before: McLAUGHLIN, CABRANES, and SACK, Circuit Judges.

SACK, Circuit Judge.

The plaintiff, Scott Huminski, is a long-time critic of the Vermont justice system who has sought to disseminate his message using a wide variety of means and media. In 1997, he became infuriated by what he thought to be his mistreatment by Vermont judges and prosecutors in the course of criminal proceedings against him. He therefore began to include angry denunciations of them in his public communications. He apparently thought himself to be a legitimate gadfly—a quintessential example of what Justice White once referred to as the "lonely pamphleteer." [1] But Vermont judges and court personnel, against the background of then-recent acts of terrorism and violence, interpreted his behavior as a potential threat to personal safety, to court property, and to the orderly conduct of court business. Vermont officials therefore broadly prohibited Huminski's presence in and around certain state courthouses. Huminski complains that the restrictions are unconstitutional.

In traversing these waters, we must avoid foundering on either of opposing shoals. One is abridgement of the rights that the First Amendment, as applied to the States through the Fourteenth Amendment, confers on members of the public and press to attend and report on judicial proceedings and to speak out on public issues. The other is impairment of the ability of courts effectively and efficiently to protect their personnel, property, and processes. We endeavor to chart a course between them.

We conclude that Huminski had an individual First Amendment right of access to court proceedings even though he was not a party to and had no other official connection with them. The right created a presumption that he was entitled to access, but one that could be overcome if court officials reasonably decided that he might pose a threat to persons, property, or proceedings and if the restrictions on his access were reasonably tailored to meet the legitimate goals of the exclusion. We conclude, however, that this individual right was not well-settled at the time of the events at issue here and that the defendants are therefore entitled to qualified immunity with respect thereto.

We also conclude that although the Rutland courthouses and grounds are nonpublic forums, singling Huminski out for a prohibition against his ability to express himself on any subject in those locations violated his First Amendment right to express himself.

In addition, we decide that defendants Sheriff Elrick, acting in his official capacity, and the Rutland County Sheriff's De-

---

1. *Branzburg v. Hayes,* 408 U.S. 665, 704, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

partment are protected by sovereign immunity from Huminski's lawsuit insofar as it seeks retrospective relief. We conclude, finally, that both Judge Corsones and Judge Zimmerman are entitled to judicial immunity with respect to these events.

## BACKGROUND

Because consideration of the issues before us requires a careful review of the record, we set forth the factual background, and the competing factual assertions of parties and witnesses, in unfortunate detail. The manner in which we are required to consider such conflicting assertions of fact differs from argument to argument on appeal, as we explain below.

At all relevant times, Huminski was a Vermont resident with an intense interest in the conduct of public officials involved in the state's justice system, in particular, members of the state judiciary and the office of the Vermont Attorney General. Huminski, acting as what he calls a "citizen reporter," disseminated his views by, among other things: becoming a source for national and local news organizations; posting signs at his residence and on his van parked in areas adjacent to public venues, such as the Vermont Statehouse and state courthouses; filing judicial conduct complaints; writing letters to public officials; and seeking public office. He based his views in part on his observations while attending state court sessions.

As of May 24, 1999, Huminski had sought to convey his views about the Vermont justice system at the Bennington District Court in Bennington, Vermont. He did so some thirty times by posting signs on his van parked there. He encountered no opposition to his doing so or to his presence at Bennington District Court proceedings.

### Criminal Charges

Huminski's interaction with Vermont's justice system had begun in earnest in February 1997, when he was charged in the Bennington District Court with two counts of obstruction of justice. He was alleged to have sought to silence a possible witness against him in a civil case by threatening to have the witness jailed for shipping alcohol to minors if the witness testified. Huminski was further alleged to have manufactured evidence that the witness was in fact shipping alcohol to minors.

Judge Nancy Corsones, a defendant in the instant proceedings, was assigned to preside in Huminski's case. Huminski and the state reached a plea agreement, which Corsones initially approved. Subsequently, however, she granted the state's motion to vacate the plea agreement, allowing the state to reinstate the charges against him. *See State v. Huminski*, No. 203–2–97 Bncr, at 12 (Vt.Dist.Ct. Sept. 4, 1998).[2] Soon thereafter, Huminski filed several complaints against Corsones regarding that decision with Vermont's Judicial Conduct Board. The complaints were ultimately dismissed as meritless.

### Letters of Complaint

In September 1998, Huminski also sent letters of complaint to several Vermont public officials. Two of the letters are of particular interest. One, bitterly complaining about what Huminski thought to be his unfair treatment at the hands of the state, was sent to Cindy Maguire, Chief of the Criminal Division of the Vermont Attorney General's Office. In it, Huminski railed against, among other things, what he referred to as Vermont "policies in

---

**2.** In December 2000, the Vermont Supreme Court reversed Corsones's judgment and dismissed the charges against Huminski. *State v. Huminski*, 171 Vt. 668, 668, 767 A.2d 97, 97 (2000).

violation of due process," and crimes against himself and his wife. He warned that he would have to "take the law into [his] own hands and initiate activities that will get national media attention." An excerpt from the letter is set forth in the margin.[3]

Huminski sent the other pertinent letter to Vermont Attorney General William Sorrell, referring to similar contentions that he had previously made. In relevant part, he wrote:

> Your willingness to pervert the law of the State of Vermont for the purpose of attacking one person is criminal. I believe the state will prevail in its goals[;] however, I believe my future activities will prevent the state from engaging in this behavior ever again. I require a response to my previous correspondences by noon today. Continued evidence of your corrupt behavior requires that I accelerate my activities.

Shortly thereafter, state law-enforcement officials investigated the correspondence. They decided that the letters were no more than Huminski's expressions of frustration with the Vermont justice system, and that they did not exhibit an intent or desire on the part of Huminski to inflict personal harm to anyone.

Corsones was neither the explicit subject nor a recipient of the letters. She nonetheless became aware of them soon after Huminski sent them. She interpreted the letters as a threat to her safety, that of her family, and that of the Vermont court system. More specifically, she thought that they contained a veiled bomb threat.[4]

Corsones's views were reinforced by fearful Bennington District Court staff members who similarly perceived the letters as threats and told Corsones so. The staff members also voiced their concern about Huminski's repeated presence at the courthouse in Bennington, particularly their fear that his van, often parked nearby, might contain a bomb.

According to Corsones, at about this time, Huminski telecopied at least four communications to her former law office,

---

3. As it is the policy of the State of Vermont to encourage and allow crimes to be committed against myself and my wife without fear of prosecution I must take the law into my own hands and initiate activities that will get national media attention. Vermont has ruined my life[;] perhaps my activities will prevent Vermont from doing the same to other oppressed individuals. Vermont's policies in violation of due process, equal protection of the law and a guarantee to a remedy at law have destroyed my life .... A State can not target an innocent citizen for destruction. When the smoke clears, the nation will wonder what went wrong in Vermont. Hopefully that inquiry will prevent you from doing this to someone else. [Huminski details his dissatisfaction with particular actions of the office of the Vermont Attorney General.]

 .... You might achieve [the] goal of driving us out of Vermont (or killing us) and attaining my destruction, [but] not without a fight. The conflict has begun. My demise won't be in vain. There will be national publicity and an outside investigation.

It[']s odd how people like you wonder why citizens form militias and arm themselves[;] now I know why. The government does target people for purely political reasons and the criminal justice system and law enforcement is a tool used by corrupt agencies to kill innocent civilians. For twenty months I have given the State multiple opportunities to prove that my assumptions in this letter were wrong[;] now it[']s time for action as the State has revealed that corrupt policies are in place at the highest levels.... No justice. No fairness. No constitution. No rights. Someone will be held accountable.

4. Corsones spoke with an agent of the Federal Bureau of Investigation about the situation. She testified that she thought that the FBI prepared a profile analysis of Huminski, but we find no such analysis in the record.

where her then-husband continued to practice law. The only such communications that we find in the record, however, are Huminski's complaints against her to the Judicial Conduct Board, which he asserts he sent to her to put her on notice of the complaints for purposes of according her due process.

*Protest at Rutland District Court*

More than six months later, on the morning of May 24, 1999, Huminski drove his van to the Rutland District Court courthouse in Rutland, Vermont—some fifty-five miles north of Bennington—where Corsones was then presiding. He later testified that his purpose was to publicize what he thought to be Corsones's "oppressive and unconstitutional conduct." Tr. of Dep. of Scott Huminski, Oct. 26, 2001, at 96. At approximately 7:30 a.m., Huminski parked his van in a legal parking space in the Rutland District Court parking lot. He displayed, on one side of the van, three signs, each measuring forty-five inches by fifty-four inches. They read, respectively:

**JUDGE CORSONES:**

**BUTCHER OF THE**

**CONSTITUTION**

\* STRIPS DEFENDANTS OF RIGHT TO DEFENSE COUNSEL

\* REINSTITUTES CHARGES VIOLATING ART 11, CH1, VT CONST.

\* PUNISHES PROTECTED EXPRESSION WITH CRIMINAL CHARGES

\* MALICIOUSLY DISREGARDS DOUBLE JEOPARDY BY REINSTITUTING CHARGES AFTER CONVICTION AND FULL PUNISHMENT

\* SUBVERTS DUE PROCESS BY VACATING BINDING PLEA AGREEMENT POST–PUNISHMENT

\* UNCONSTITUTIONALLY PUNISHES DEFENDANT FOR SEEKING REDRESS OF GRIEVANCES IN CIVIL COURT

\* IGNORES AND ENCOURAGES PROSECUTORIAL VIOLATIONS OF THE CODE OF PROFESSIONAL RESPONSIBILITY

**CORSONES' OPINION**

[Displayed was a copy of Corsones's September 4, 1998, opinion vacating Huminski's plea agreement.]

**THE LAW**

[Displayed were the decision of another state's criminal court and three motions by Huminski to vacate Corsones's September 4, 1998, opinion and to dismiss the charges against him in his case before Corsones.]

Despite the presence of the signs on the van, Huminski later testified, its interior remained visible through the windows that were not blocked by the posters. This was the first time Huminski had explicitly mentioned Corsones in a public protest.

According to the deposition testimony of Deputy Sheriffs Steven Schutt and Mark Beezup of the defendant Rutland County Sheriff's Department, they were on a security detail at the Rutland District Court that morning pursuant to a contract between the Sheriff's Department and the Vermont Court Administrator's Office. The performance of the contract was supervised by the defendant Rutland County Sheriff R.J. Elrick.[5] They noticed the van and the signs on it, which, Schutt recalled, contained Corsones's name. They saw

---

**5.** The parties refer to Elrick as the Rutland County Sheriff in the caption of this appeal and their briefs before us. We adhere to their characterization, although the district court reported, *Huminski v. Rutland County Sher-* *iff's Dep't*, 211 F.Supp.2d 520, 531 (D.Vt. 2002), and there are indications in the record, that he was in fact a deputy sheriff. Our analysis is not affected by this distinction.

that although some of the van's windows were covered, others were visible and presumably would permit them to see into the vehicle.[6] Neither Schutt nor Beezup could recall whether either of them said anything to Huminski that morning, although Schutt remembered that Huminski said that he was there to observe the day's court proceedings and Beezup thought it likely that another officer on the scene spoke with Huminski.

The deputy sheriffs contacted their supervisor, Captain Bruce Sherwin. They asked him whether the presence of the signs on the van violated the law. Sherwin responded that they did not. According to Beezup and Schutt, they then returned from the parking lot to the courthouse.

Huminski testified, however, that Schutt and Beezup told him before returning to the courthouse that they had a problem with the signs on the van and asked him to remove them. Huminski refused. They then asked him to move his van to the back of the parking lot. Again he refused. Finally, Beezup told Huminski that the parking lot was for official court business only. Huminski replied that he was there to attend the day's court proceedings. Neither deputy sheriff voiced a security-related concern about either Huminski's signs or his parked van.

When Corsones arrived at the Rutland District Court that day, she entered through the employee side-entrance. According to her deposition testimony, a court staff member met her there and told her—mistakenly—that Huminski had improperly or illegally parked his van near the building on the other side of the courthouse. The staff member told her that a court deputy had asked Huminski to move his van, which he refused to do. The apparently skittish staff member also told her—again mistakenly—that no one could see inside the rear of the van. And a staff member reported that the signs called Corsones a "butcher." Corsones herself never saw the van or the signs.

Deputy Sheriff Schutt also told Corsones that there was a van parked outside the courthouse with signs on it that mentioned her. According to Schutt's and Beezup's deposition testimony, Corsones responded that Huminski had criminal charges pending against him in Bennington and that he had threatened her with regard to the charges. She later testified that, at the time, she was alarmed by what she had been told that morning because of the earlier letters Huminski had sent and because she thought that Huminski was obsessed with her as a result of her previous reinstatement of the criminal charges against him. She was particularly afraid that Huminski's van might contain explosives, although she did not tell the deputies so. Beezup testified that Corsones asked Schutt and him "if we could do something with [Huminski] . . .—basically, she didn't want him on the property." Tr. of Dep. of Deputy Sheriff Mark Beezup, Oct. 24, 2001, at 7.

The defendant Karen Predom, Court Manager for the Rutland District Court and the Rutland Family Court, was, at about this time, informed of the Huminski situation. One of Predom's responsibilities was maintenance of security at the courthouse. She therefore attempted to keep track of Huminski's whereabouts. She also telephoned Ed Polk, Vermont's statewide Director of Court Security, bringing him up to date on the incident.

---

**6.** Schutt testified that he could see through the front window and underneath the van, and Beezup testified that he could see through the van's windows into the back of the van.

Corsones spoke with Predom at some length about Huminski's presence. She told Predom about the history of her previous interactions with him in Bennington and the letters he had sent to public officials. Predom later testified that based on this information, Huminski's activities worried her, particularly because of then relatively recent detonations of explosives in vehicles inside the garage of the World Trade Center in New York in 1993 and alongside the Alfred P. Murrah Federal Building in Oklahoma City in 1995. Her fears were exacerbated by her mistaken understanding that no one could see the inside of Huminski's van.

After their initial conversation, Predom and Corsones together placed another telephone call to Polk to discuss Huminski. They told Polk about their fears. The three discussed the possibility of having the situation investigated or of issuing a "Notice Against Trespass" to Huminski covering the Rutland District Court.

Corsones was unwilling to begin proceedings in her courtroom while the perceived threats to her personal security remained unresolved. Predom therefore telephoned the defendant Rutland District Court Judge M. Patricia Zimmerman, who was presiding that day in Rutland Family Court. Predom told Zimmerman that Huminski had a vehicle parked at the courthouse with signs on it and that at least one sign discussed Corsones. Predom asked Zimmerman whether, given the Huminski issue, she would handle Corsones's docket

that morning. Zimmerman demurred on the ground that her own docket was full.

*May 24 Notice Against Trespass*

Corsones told the court staff that because of Huminski's Judicial Conduct Board complaints against her, she would not participate in any decision about the court's response to his presence.[7] It was Predom, then, who took charge of the situation. She decided to issue a Notice Against Trespass to Huminski. Corsones, meanwhile, requested that Schutt issue a parallel Notice Against Trespass to Huminski covering her residence and her former law office.

At about 8:30 a.m., an hour after the incident had begun, Rutland City Police Officer Robert Emerick was dispatched to the Rutland District Court to meet with Predom in response to her request that a Notice Against Trespass be issued.[8] The Sheriff's Department "LAW Incident Table" listed Corsones as the complainant.[9] When Emerick arrived, Predom requested that he serve a trespass notice on Huminski.[10]

Predom told Emerick that Huminski had already created difficulties, without detailing them. Emerick then completed the form for a Notice Against Trespass based on Predom's instructions.

The completed form (the "May 24 Notice") stated that Huminski was "not to enter upon or remain upon the property that is lawfully possessed by" the Rutland

---

7. Schutt wrote in a report, however, that Corsones asked that, for safety reasons, a Notice Against Trespass for the Rutland District Court, her residence, and her former law office be served on Huminski.

8. Predom testified inconsistently both that she did not call law enforcement officials in this regard, and that she did.

9. Based on his reading of this table, Schutt testified that Corsones herself had requested that the trespass notice be issued. No other involved party, however, either read the report that way or stated that Corsones had requested the issuance of the trespass notice.

10. Emerick did not see Huminski's van when he arrived at the courthouse because he, like Corsones, entered on the side opposite the one where the van was parked.

District Court. The May 24 Notice permitted Huminski to enter upon and remain upon the Rutland court property, however, "*only* when [he had] a *written notice* from the court directing [his] appearance or if [he had] made prior arrangements or permission of the court manager" (emphasis in original). Predom signed the May 24 Notice as the "owner" or "tenant" of the Rutland District Court.

At about the same time, Captain Sherwin informed Sheriff Elrick that Huminski was present on court property; that he had parked his vehicle, with signs mounted on it, in the court parking lot; and that court staff members had contacted the Sheriff's Department to convey their concern. Elrick thought Huminski to be a potential security risk based on information he had theretofore received from Corsones and others. At some point during the prior several weeks, Corsones had told him about her fears. Elrick had also previously learned that members of the staff of the Bennington District Court thought that the purpose of Huminski's presence at the courthouse was to intimidate them and that they were in fact afraid of him.

Elrick drove to the Rutland District Court. When he arrived, he saw Huminski's van. He also saw the signs, although he did not get close enough to read them.

Officer Emerick informed Sheriff Elrick that he, Emerick, was going to serve the May 24 Notice on Huminski. Emerick asked Elrick to accompany him. Elrick did not participate in the decision to issue

the notice. He was unaware that court personnel feared that Huminski's van contained explosives.

Shortly before 9 a.m., Huminski entered the courthouse, where he underwent security screening without incident. He waited quietly in the hallway for the day's proceedings to begin. Soon thereafter, Emerick approached Huminski and asked him to retire to a conference room with Emerick, Elrick, and Deputy Sheriff Schutt. Once inside, Emerick served Huminski with the May 24 Notice.[11]

Huminski refused to acknowledge formally his receipt of the May 24 Notice. Elrick therefore signed it as a witness instead. Schutt also served Huminski with similar Notices Against Trespass for Corsones's residence and her former law office. Elrick signed these notices, too, in the face of Huminski's refusal to execute an acknowledgment of their receipt. Huminski was told that he would be in violation of the May 24 Notice if he did ·not leave the courthouse. He therefore left, peacefully, with the three trespass notices in hand.

*May 27 Notice Against Trespass*

Soon after the incident at the Rutland courthouse, Elrick discovered that because of a then-recent statutory change, the May 24 Notice was improperly executed inasmuch as it had been signed by Predom alone. Elrick understood that under the new Vermont law, the court administrator's office was responsible for state court-

---

**11.** Emerick served Huminski with the May 24 Notice pursuant to Vt. Stat. Ann. tit. 13, § 3705(a)(1). According to section 3705:

A person shall be imprisoned for not more than three months or fined not more than $500.00, or both, if without legal authority or the consent of the person in lawful possession, he enters or remains on any land or in any place as to which *notice against trespass* is given by:

(1) Actual communication by the person in lawful possession or his agent or by a law enforcement officer acting on behalf of such person or his agent; or
(2) Signs or placards so designed and situated as to give reasonable notice.

Vt. Stat. Ann. tit. 13, § 3705(a) (emphasis added). This was the first Notice Against Trespass of the Rutland District Court that had been issued in at least five years.

houses but the Vermont Commissioner of Buildings and General Services (the "Commissioner") was now responsible for the grounds adjacent to the courthouses and other state property. Predom therefore could execute a trespass notice only for the courthouse, not for the adjacent parking lot and other grounds. The Commissioner told Elrick that he could act as the Commissioner's agent to sign a renewed Notice Against Trespass applicable to the courthouse grounds and other state property on his behalf.

The court administrator's office and the administrative judge of the Rutland District Court therefore decided that a presiding judge would sign another Notice Against Trespass on behalf of the Rutland District Court. On May 27, 1999, another Notice Against Trespass (the "May 27 Notice") was therefore issued and served on Huminski, barring him from "enter[ing] upon or remain[ing] upon the property that is lawfully possessed by" the Rutland District Court. The May 27 Notice further identified the property as that "located in the Town of Rutland, County of Rutland, State of Vermont," which included "[a]ll lands and property under the control of the Supreme Court and the Commissioner of Buildings and General Services, including the Rutland District Court, parking areas, and lands."[12] It was executed jointly by Zimmerman, on behalf of the court administrator's office as a presiding judge in the Rutland District Court (to cover the courthouse), and Elrick, as the agent of the Commissioner (to cover other court property). Zimmerman signed it after Elrick briefed her about Huminski's van being parked in the courthouse parking lot on May 24 and about

what he thought was an inability to see *underneath* the van. By this time, Zimmerman had also learned of the general tenor of the two letters by Huminski to the Vermont Attorney General's office and had been told that Huminski had persistently tried to contact Corsones by letter and telecopy. The May 24 Notice signed by Predom was not, however, formally withdrawn. Huminski promptly moved in the Rutland District Court to vacate the May 24 and May 27 Notices and to disqualify Corsones from adjudicating the motions. A presiding judge—neither Corsones nor Zimmerman—decided that the motion to disqualify Corsones was moot. While doing so, the court noted its understanding that the May 24 Notice had been withdrawn, presumably by operation of the issuance of the May 27 Notice. The court concluded, however, that "the district court is a court of limited jurisdiction and cannot convene a 'special proceeding' to determine those issues." June 29, 1999, Entry Regarding Motion in *Huminski v. Rutland Dist. Court* (Vt.Dist.Ct.1999). It also determined that because the court was itself a respondent in the proceedings, Huminski would be required to pursue his claims elsewhere.

Huminski later testified that the trespass notices have limited his ability to attend court sessions to observe judicial proceedings, which in turn has interfered with his ability to gather information and disseminate his views about the Vermont judicial system. He also testified that the notices have stopped him from fully continuing his protest activities at the Rutland District Court and other Vermont state

---

12. The Bennington Superior Court, in which Huminski had multiple pending proceedings, is the only Vermont state court that has interpreted the May 27 Notice. It suggested that it read the May 27 Notice as incapable of being reasonably construed to cover any property outside of Rutland. It ruled that in any case, the May 27 Notice had no legal effect over the buildings, lands, and premises that make up the Bennington Superior Court.

courts because of his fear of arrest and criminal prosecution.

### District Court Proceedings

On June 1, 1999, Huminski filed suit against Corsones, Zimmerman, Predom, Elrick, and the Rutland County Sheriff's Department, in the United States District Court for the District of Vermont. He claimed, among other things, that the defendants had deprived him of his First and Fourteenth Amendment rights to criticize public officials and to gain access to courthouses. He invoked 42 U.S.C. § 1983, requesting declaratory, injunctive, and monetary relief.[13]

On February 2, 2001, Huminski moved in the district court for a preliminary injunction prohibiting the defendants from enforcing the May 24 and May 27 Notices, as well as any future trespass notices, until the court rendered a decision on the merits of the case. On February 27, 2001, the court (J. Garvan Murtha, *Judge*) preliminarily enjoined the defendants "from issuing or enforcing any notices of trespass against Huminski that prevent him from accessing court property where such notices are based solely upon Huminski's public expression of his political opinions so long as the expression does not disrupt or threaten the orderly performance of court business." *Huminski v. Rutland County*, 134 F.Supp.2d 362, 366 (D.Vt. 2001) (*"Huminski I "*). The court reasoned that Huminski's allegations of First Amendment violations were sufficient to

demonstrate that he would suffer irreparable harm if the injunction did not issue and that he was likely to succeed on the merits of his claims. *See id.* at 363–66.

On March 9, 2001, Corsones and Zimmerman moved to dismiss Huminski's complaint on the grounds, among others, that they were absolutely immune from suit under the doctrine of judicial immunity and that they were immune from suit in their official capacities under the Eleventh Amendment. The district court denied the motion in part and granted it in part. *See Huminski v. Rutland County*, 148 F.Supp.2d 373, 376 (D.Vt.2001) (*"Huminski II "*). The court reasoned that there could be no finding of judicial immunity as a matter of law because the defendant judges had not addressed whether they had the authority to issue the May 24 or May 27 Notices based on the information they had at the time. *Id.* at 378. The court concluded, though, that as state officers, Corsones and Zimmerman were not persons subject to suit insofar as they were sued in their official capacities for retrospective relief. They were therefore immune from suit in that regard. *Id.* at 379. In the district court's view, however, they were subject in that capacity to claims for prospective relief and therefore remained subject to the previously entered preliminary injunction. *Id.*

On January 31, 2002, and February 1, 2002, the various defendants moved for

---

**13.** Huminski had originally also sued others, including the Bennington County Sheriff's Department, Sheriff Gary Forrest, Deputy Schutt, Officer Emerick, the City of Rutland, and the Rutland City Police Department. On August 31, 1999, the district court (J. Garvan Murtha, *Judge*) granted a motion to dismiss Huminski's claims against the Rutland City Police Department. On October 20, 1999, the district court granted a motion to dismiss all claims against the Rutland County Sheriff's Department, the Bennington County Sheriff's Department, Elrick, Forrest, and Emerick and granted a motion for judgment on the pleadings to Emerick and the City of Rutland. On July 20, 2000, we dismissed Huminski's appeal from these interlocutory orders due to the absence of appellate jurisdiction. *Huminski v. Rutland City Police Dep't*, 221 F.3d 357, 362 (2d Cir.2000) (per curiam). Subsequent to these rulings, on February 23, 2001, Huminski filed an amended complaint suing the current set of defendants.

summary judgment. Elrick and the Rutland County Sheriff's Department argued, among other things, that they were entitled to sovereign immunity and qualified immunity, that there was no basis on which to grant a permanent injunction against them, and that the Department could not be liable under 42 U.S.C. § 1983 for the actions of its employees under the doctrine of *respondeat superior*. Corsones and Zimmerman asserted in relevant part that they were entitled to absolute judicial immunity and to qualified immunity. And Predom contended, among other things, that she was entitled to qualified immunity, that Huminski had not suffered any injury, and that injunctive relief was unwarranted because there was no continuing violation of federal law.

On January 31, 2002, Huminski cross-moved for partial summary judgment and asked that the injunction be made permanent on the grounds that, construing the evidence in the light most favorable to the defendants, their actions violated his constitutional rights to attend court hearings and to criticize public officials. He also contended that neither judicial nor qualified immunity protected the defendants' actions.

On July 11, 2002, the district court, in a thoughtful and thorough opinion, ruled that Predom, Corsones, and Zimmerman were immune from suit in federal court insofar as Huminski sought damages against them in their official capacities. *Huminski v. Rutland County Sheriff's Dep't*, 211 F.Supp.2d 520, 531 (D.Vt.2002) ("*Huminski III*"). The court also decided that Elrick was immune from liability under section 1983 in his official capacity because he acted for the State of Vermont with respect to state courthouse security. *Id.* at 531–32. For that reason, the Department was similarly immune. *Id.* at 532 n. 20.

What then remained of Huminski's section 1983 claims were his requests (1) for monetary relief against Predom, Elrick, Corsones, and Zimmerman in their personal capacities for alleged past constitutional violations, and (2) for permanent injunctive and declaratory relief against Predom, Corsones, and Zimmerman in their official capacities for alleged ongoing constitutional violations. *Id.* at 532.

The district court concluded that Corsones and Zimmerman did not qualify for judicial immunity. *Id.* at 535. It ruled that "the issuance of a criminal trespass notice in Vermont is not a judicial act." *Id.* at 533. It held that Corsones's involvement in the decisionmaking process that led to the issuance of the trespass notices was sufficient to trigger possible personal liability for her. *Id.* at 533–34. According to the court, the judges were "act[ing] in a . . . non-judicial capacity—as the representative of the true landowner (the State of Vermont)—in facilitating the issuance of the initial trespass notice." *Id.* at 534 (Corsones); *see also id.* at 535 (Zimmerman). Moreover, the court reasoned, "the general rule that judges act in a judicial capacity whenever they order the removal of persons from their courtroom who disrupt or otherwise negatively impact the judicial process" did not apply because providing security at a courthouse building is not an adjudicative function. *Id.* at 534. The court also observed that the Vermont statute that entrusts the state judiciary with the duty to maintain security at Vermont courthouses does not transform trespass notices issued by state judicial officers into judicial acts. *Id.* Finally, the court concluded that the judges' actions were not judicial in nature "because Huminski had no official business" at the Rutland District Court on the morning in question. *Id.* at 534–35.

Turning to the First Amendment questions raised by the parties' motions, the district court construed the May 27 Notice as barring Huminski from all lands and property under control of the Vermont Supreme Court, even those outside of Rutland. *See id.* at 528–29 & 529 n. 11. The court determined that these lands and property (including state court buildings and their adjacent parking lots) were neither "traditional public fora" nor "designated public fora," but were instead "nonpublic fora." *See id.* at 537–39. The court therefore addressed the question whether the trespass notices were a reasonable and viewpoint-neutral restriction of expressive activity, the test for evaluation of restrictions of expressive activity in nonpublic forums. *See id.* at 539–42. The court did not separately address Huminski's claim that the defendants violated his First Amendment right of access to judicial proceedings.

The district court concluded that there were genuine issues of material fact precluding the grant of summary judgment on the issue whether the trespass notices were viewpoint neutral. It therefore denied Predom's, Corsones's, and Zimmerman's motions for summary judgment with respect to Huminski's claims for monetary relief on the ground of qualified immunity. *See id.* at 539–40. The court reasoned that there was a genuine dispute as to whether the defendants' actions were motivated by security concerns or by disagreement with the views reflected on the signs on Huminski's van. *Id.* at 529. The court decided that some of the circumstances, such as the expression of concern about Huminski to Corsones by court staff at the Bennington District Court, supported the defendants' position. *Id.* at 529–30. But it also was of the view that countervailing considerations—such as the fact that Huminski had never before caused a disturbance relating to his criticism of Corsones and the

fact that although Huminski had participated in many previous protests, he was cited for trespass the first time that he criticized Corsones—supported Huminski's position that these defendants violated his right to be free from governmental discrimination against him as a speaker based on disagreement with his viewpoint. *Id.* at 530–31. The court concluded that there was therefore a genuine dispute as to a material fact—viewpoint neutrality—that precluded summary judgment. *Id.* at 540.

But the court granted Elrick's motion for summary judgment as to Huminski's claims for monetary relief against Elrick in his personal capacity, concluding that he was entitled to qualified immunity. *Id.* at 542. The court reasoned that inasmuch as Elrick never saw Huminski's protest signs, he could not have engaged in viewpoint discrimination. *Id.* Even had Elrick seen the signs, moreover, Huminski "fail[ed] to demonstrate that a reasonable official in [Elrick's] position ... would have known that the notices against trespass were 'clearly' unreasonable." *Id.*

The court then denied Huminski's motion for partial summary judgment on his demands for monetary relief. *See id.* at 542. The court, now viewing the evidence most favorably to the defendants, decided that the trespass notices were reasonable in light of the purpose of the state court facilities and the availability of alternative means by which Huminski could have communicated his grievances. The court also said that Huminski had failed to demonstrate that "a reasonable official in Defendants' position—and therefore concerned about security in light of Huminski's presence—would have known that the notices against trespass were 'clearly' unreasonable as a matter of law." *Id.* Because the court concluded that there was "no reasonable likelihood" that Huminski would suc-

ceed on the merits, it also dissolved its preliminary injunction. *Id.* at 542–43.

Subsequently, on August 22, 2002, the district court granted Huminski's motion to stay its dissolution of the preliminary injunction pending further proceedings. *Huminski v. Rutland County Sheriff's Dep't,* No. 1:99–CV–160, at 16–19 (D.Vt. Aug.22, 2002). It also granted Huminski's motion for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) of its ruling that the trespass notices were reasonable under the First Amendment given the state's legitimate interests. *Id.* at 2–10, 19; *Huminski v. Rutland County Sheriff's Dep't,* No. 1:99–CV–160, at 1–2 (D.Vt. Jan.16, 2003). We agreed to hear the appeal. *Huminski v. Corsones,* No. 03–6059 (2d Cir. Apr. 4, 2003).

Pursuant to the certification, Huminski appeals the district court's conclusion as to the reasonableness of the trespass notices under the First Amendment, the court's dissolution of the preliminary injunction, and the court's grant of summary judgment to Elrick. Corsones and Zimmerman appeal the district court's denial of their motion for summary judgment on the grounds of judicial immunity and qualified immunity. Predom appeals the court's denial of her motion for summary judgment on the ground of qualified immunity.[14]

## DISCUSSION

### I. *Standard of Review*

■ "We may overturn a district court's decision to dissolve a preliminary injunction only if it constitutes an abuse of discretion, which usually involves either the application of an incorrect legal standard or reliance on clearly erroneous findings of fact." *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.,* 211 F.3d 21, 24 (2d Cir.) (citation and internal quotation marks omitted), *cert. denied,* 531 U.S. 872, 121 S.Ct. 173, 148 L.Ed.2d 118 (2000).

■ We review a district court's grant or denial of summary judgment *de novo.* *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.,* 345 F.3d 154, 165 (2d Cir.2003). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Castro v. United States,* 34 F.3d 106, 112 (2d Cir. 1994). The motion should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We "construe the evidence in the light most favorable to the non-moving party and ... draw all reasonable inferences in its favor." *World Trade Ctr.,* 345 F.3d at 166. Only when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[ is there] no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation and internal quotation marks omitted).

### II. *Sovereign Immunity*

■ In granting Sheriff Elrick's motion for summary judgment, the district court held that Elrick is immune from liability under section 1983 in his official capacity because he acted for the State of Vermont

---

14. Huminski does not appeal the district court's recognition of Corsones's, Zimmerman's, and Predom's immunity with respect to retrospective relief in their official capacities. He also does not appeal the court's grant of Elrick's motion for summary judgment as to Huminski's claims for monetary relief against him in his personal capacity on the ground that he was entitled to qualified immunity.

with respect to state courthouse security. *Huminski III*, 211 F.Supp.2d at 531–32. By extension, it also concluded that the Rutland County Sheriff's Department is similarly immune. *Id.* at 532 n. 20. Huminski contends that the district court erred in according Elrick the benefit of sovereign immunity as a state official with responsibility for state courthouse security because he is a county official for whom sovereign immunity is not warranted with regard to either his involvement in issuing the Notices Against Trespass or any future involvement in enforcing the trespass notices. Huminski also contends that to the extent Elrick was a state official, he is in any event subject in his official capacity to injunctive and other prospective relief. Elrick responds that he is immune from Huminski's suit insofar as it seeks retrospective relief because all of his actions relevant to this appeal were taken while Elrick was acting as a state official with respect to state courthouse security.

## A. *General Principles*

■ "[N]either a State nor its officials acting in their official capacities are 'persons' under [42 U.S.C.]§ 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).[15] Therefore, state officials cannot be sued in their official capacities for retrospective relief under section 1983. *See id.* Nonetheless, state officials can be subject to suit in their official capacities for injunctive or other prospective relief. *Id.* at 71 n. 10, 109 S.Ct. 2304. Suit can also be brought against them under section 1983 in their individual capacities for both prospective

and retrospective relief. *See Hafer v. Melo*, 502 U.S. 21, 23, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 414 (2d Cir. 1999).

■ On the other hand, "local government officials sued in their official capacities are 'persons' under [42 U.S.C.] § 1983 in those cases in which ... a local government would be suable in its own name." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ Whether a defendant is a state or local official depends on whether the defendant represented a state or a local government entity when engaged in the events at issue. *See McMillian v. Monroe County*, 520 U.S. 781, 785–86, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). To answer that question here, we must determine, *inter alia*, whether it was the State of Vermont or Rutland County that controlled Elrick in his involvement in the events leading up to and culminating in his serving Huminski with the trespass notices.

[O]ur inquiry is dependent on an analysis of state law. This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy. But our understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's function under relevant state law.

---

**15.** Section 1983 provides in relevant part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....
42 U.S.C. § 1983.

*Id.* at 786, 117 S.Ct. 1734 (citations omitted). Relevant factors in determining the status of an official include how the state's laws and courts categorize the official; whether the official is elected and by whom; the scope of the official's duties; to whom the official is fiscally responsible, if anyone; which governmental entity sets or pays the official's salary; which governmental entity provides the official's equipment, if any; and the scope of the official's jurisdiction. *See id.* at 787–91, 117 S.Ct. 1734.[16] For a law-enforcement official, the most important factor in making this determination is whether he or she has the authority to investigate and enforce the state's criminal law. *See id.* at 790, 117 S.Ct. 1734. Whether a sheriff is elected statewide or countywide and where a sheriff's jurisdictional boundaries lie are, by contrast, relatively unimportant factors. *See id.* at 794, 117 S.Ct. 1734 ("As the basic forms of English government were transplanted in our country, it also became the common understanding here that the sheriff, though limited in jurisdiction to his county and generally elected by county voters, was in reality an officer of the State, and ultimately represented the State in fulfilling his duty to keep the peace." (footnote omitted)). The impact of a governmental entity's payment of an official's salary, moreover, although important, is softened if that entity does not control the amount of the salary or cannot refuse to pay the salary entirely. *See id.* at 791, 117 S.Ct. 1734. With these factors in mind, we review Vermont's statutory scheme to assess the function and control of sheriffs and sheriff's departments.

B. *The Status of Sheriffs under Vermont Law*

Vermont Statutes Title Twenty–Four, Chapter Five, contains provisions regarding the powers and duties of sheriffs and sheriff's departments. It establishes a sheriff's department in each Vermont county. Vt. Stat. Ann. tit. 24, § 290(a). Each department consists of a sheriff elected by the people of the county and, as appointed by the sheriff, deputy sheriffs and supporting staff. *Id.; see also* Vt. Const. ch. II, § 50 (providing for the election of sheriffs by the voters of their respective districts). According to the statute, "[f]ull-time employees of the sheriff's department, paid by the county, [are] county employees for all purposes but [are] eligible to join the state employees retirement system, provided the county [pays] the employer's share." Vt. Stat. Ann. tit. 24, § 290(a).[17]

A sheriff's duties include preserving the peace. *Id.* § 299.[18] The powers of sheriffs and their deputies with respect to

---

**16.** In *McMillian,* the Supreme Court held that Alabama sheriffs were state officials, rather than county officials, because they were constitutionally members of the state executive department; were impeachable by state courts; were state officers for immunity purposes, according to state courts; were required to obey the orders of state courts, even those outside of their county; had complete authority to enforce the state criminal law in their counties; were required to present evidence to the county's district attorneys, who were state officials; were paid salaries set by the state, even though they were elected on a countywide basis; were required to submit accounting statements and funds to the county treasurer; were provided with equipment by the county; were paid salaries out of the county treasury; and had jurisdiction only within the county. *McMillian,* 520 U.S. at 787–91, 117 S.Ct. 1734.

**17.** By contrast, the State of Vermont pays the salaries of full-time deputy sheriffs whose primary job is to transport prisoners and mentally ill individuals. Vt. Stat. Ann. tit. 24, § 290(b).

**18.** Deputy sheriffs may also perform this and any of the sheriff's other official duties. *See* Vt. Stat. Ann. tit. 24, § 309.

criminal matters and law enforcement extend statewide. *Id.* §§ 307(c), 312. "The sheriff's department [is also] entitled to utilize all state services available to a town within the county." *Id.* § 290(a).

Sheriffs and full-time deputy sheriffs must provide Vermont's Commissioner of the Department of Finance and Management and their county clerk quarterly reports as to their compensation received as sheriffs. *Id.* § 290b(a); *see also id.* tit. 3, app., Exec. Order No. 3–11 (establishing the commissioner's position). Vermont's Auditor of Accounts has the power to audit each department's accounts at any time, receives information from the state's sheriff's departments and sheriffs about these accounts, establishes a uniform accounting system for these departments, and annually reviews the accounting records thereof. *Id.* tit. 24, §§ 290b(b)-(e); *see also* Vt. Const. ch. II, § 48 (requiring the Auditor of Accounts to be elected by the state's voters on the same ticket as the Governor).

A sheriff may enter into a written contract with the State of Vermont or a town within the relevant county "to provide law enforcement or other related services including, but not limited to, security services." Vt. Stat. Ann. tit. 24, § 291a(a).[19]

### C. *Sheriff Elrick's Assertion of Sovereign Immunity*

Sovereign immunity, in these circumstances, operates only retrospectively. Elrick cannot benefit from such immunity with respect to his possible future behavior, with regard to enforcement of the trespass notices or otherwise. *See Will,* 491 U.S. at 71 n.10. The retrospective relief that Huminski seeks from Elrick concerns only his actions that led up to and culminated in the issuance of the Notices Against Trespass. We must therefore determine whether Elrick was a Rutland County official or a Vermont official only with regard to those actions.

We agree with the district court that an analysis of the relevant factors indicates that Sheriff Elrick was a state official with regard to his involvement in the events related to the issuance of the trespass notices. The Rutland County Sheriff's Department, for whom Elrick was employed, had a contract with the State of Vermont through the Vermont Court Administrator's Office to manage security at the Rutland District Court. We think that Elrick was acting as a state official while doing so and when he played a role in the issuance and service of the trespass notices.[20]

First, when Elrick was performing the contract, he was acting as a supervisory policymaker for the State of Vermont, irrespective of what his status was when he performed his other duties as a sheriff.

Second, it is undisputed that Elrick acted as a state official when he signed the

---

19. According to Vermont law, the court officer for sessions of a state district court held in a territorial unit shall be a sheriff of any county in that unit, a constable, or an indifferent person, when necessary. Vt. Stat. Ann. tit. 4, § 446. With regard to participation in the judicial system, sheriffs and deputy sheriffs also have the authority to serve either civil or criminal process anywhere within the state and returnable to any court. *Id.* tit. 12, §§ 691–692; *see also id.* tit. 24, § 293. Furthermore, they "shall receive all writs and precepts issuing from lawful authority at any time and place within their respective precincts . . . and shall execute and return the same agreeably to the direction thereof." *Id.* tit. 12, § 696; *see also id.* § 4854 (discussing specifically the sheriff's involvement in serving a writ of possession in an ejectment action); *id.* tit. 24, § 293.

20. We think this is true even if Elrick is a deputy sheriff in light of the fact that the state statute requires that deputy sheriffs be considered as employees of the sheriff's department when they are performing duties under such a contract. *See* Vt. Stat. Ann. tit. 24, § 291a(a).

May 27 Notice as the agent of the Commissioner, himself a state official.[21]

Third, although it is not necessary to decide the broader issue, we think that in light of the statutory structure under which Elrick acted, he was likely a state official when he was performing his general duties for the sheriff's department, particularly when he was acting pursuant to state law, as he was with respect to the Huminski incident. State statute establishes the most important factor in this inquiry, *see McMillian*, 520 U.S. at 790, 117 S.Ct. 1734: Elrick had the authority to investigate and enforce the State of Vermont's criminal law in Rutland County.

■ He was therefore acting for the state when he engaged in the behavior that is at issue here. It follows that Elrick is immune in his official capacity from suit for retrospective relief. Because Elrick is entitled to sovereign immunity, we also affirm the district court's holding that the Rutland County Sheriff's Department is similarly immune. Neither of these defendants is immune, however, from injunctive or other prospective relief for an ongoing violation of federal law. *See Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908). To the extent that the district court held otherwise, we reverse.

## III. *Judicial Immunity*

■ The district court denied the motion by Judges Corsones and Zimmerman for summary judgment in part because of its conclusion that they were not entitled to judicial immunity. Corsones and Zimmerman maintain that the district court erred in so ruling because, in performing the acts that underlie Huminski's claims, they were acting within their judicial capacities to protect court security and court operations. They also assert that Huminski's dealings with the judges were in their judicial capacities with respect to the issuance of the trespass notices. Huminski replies that neither Corsones nor Zimmerman acted in her judicial capacity but instead each acted in her administrative capacity, and, similarly, that Huminski's dealings with the judges were not in their judicial capacities. He asks us to conclude that they are therefore not protected by judicial immunity.

We ultimately conclude that Corsones and Zimmerman are entitled to qualified immunity with respect to their behavior relating to the issuance of the Notices Against Trespass in connection with Huminski's claim that they violated his First Amendment right of access to the courthouse, but that they would not, as a matter of law, be qualifiedly immune with respect to his claim that they violated his First Amendment right to criticize public officials. *See infra* sections IV.A.4, IV.B.2. Inasmuch as they are not shielded by qualified immunity from prospective relief and are not protected by such immunity from monetary relief with respect to Huminski's free-expression claims, we must consider their assertion that judicial immunity protects them.

### A. *General Principles*

Judicial immunity has been created both by statute and by judicial decision "for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (citation and internal quotation marks omitted); *see also Stump v. Sparkman*, 435 U.S. 349, 355, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978)

---

**21.** *See supra* note [11].

("As early as 1872, the [Supreme] Court recognized that it was a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, should be free to act upon his own convictions, without apprehension of personal consequences to himself." (citation, internal quotation marks, and alterations omitted)).[22] "Imposing ... a burden [of exposure to liability] on judges would contribute not to principled and fearless decision-making but to intimidation." *Pierson,* 386 U.S. at 554, 87 S.Ct. 1213. Judges, acting as judges, who are threatened with personal liability for those actions,

> may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct. In this way, exposing [judges] to the same legal hazards faced by other citizens may detract from the rule of law instead of contributing to it.

*Forrester v. White,* 484 U.S. 219, 223, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988).

In furtherance of these ends, "in any action brought against a judicial officer [pursuant to 42 U.S.C. § 1983] for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983;[23] *see also Montero v. Travis,* 171 F.3d 757, 761 (2d Cir.1999) (per curiam) (discussing this statutory form of judicial immunity in the context of section 1983 actions).

Judges are, of course, immune from liability for damages under many circumstances. *See, e.g., Pierson,* 386 U.S. at 553–54, 87 S.Ct. 1213; *Heimbach v. Vill. of Lyons,* 597 F.2d 344, 347 (2d Cir.1979) (per curiam).

> [T]he necessary inquiry in determining whether a defendant judge is immune from suit [for damages] is whether at the time he took the challenged action he had jurisdiction over the subject matter before him.... [T]he scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge. A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability ... when he has acted in the clear absence of all jurisdiction.

*Stump,* 435 U.S. at 356–57, 98 S.Ct. 1099 (citation and internal quotation marks omitted). As intimated by the *Stump* excerpt, our determination that a judicial official is entitled to judicial immunity "is not overcome by allegations of bad faith or

---

**22.** Other considerations underlying judicial immunity include insulation of judges from political influence and the correct ability of error on appeal. *Cleavinger v. Saxner,* 474 U.S. 193, 202, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985). "Judicial immunity apparently originated, in medieval times, as a device for discouraging collateral attacks and thereby helping to establish appellate procedures as the standard system for correcting judicial error." *Forrester v. White,* 484 U.S. 219, 225, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). "Most judicial mistakes or wrongs are open to correction through ordinary mechanisms of review, which are largely free of the harmful side-effects inevitably associated with exposing judges to personal liability." *Id.* at 227, 108 S.Ct. 538.

**23.** In 1996, Congress amended section 1983 to enact this statutory immunity. Federal Courts Improvement Act of 1996, § 309(c), Pub.L. No. 104–317, 110 Stat. 3847, 3853 (1996) (amending 42 U.S.C. § 1983). Before the amendment, "a judge [wa]s not absolutely immune from ... a suit for prospective injunctive relief." *Mireles v. Waco,* 502 U.S. 9, 10 n. 1, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991) (per curiam).

malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial." *Mireles v. Waco*, 502 U.S. 9, 11, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991) (per curiam); *see also Tucker v. Outwater*, 118 F.3d 930, 932 (2d Cir.), *cert. denied*, 522 U.S. 997, 118 S.Ct. 562, 139 L.Ed.2d 402 (1997). Thus, if the relevant action is judicial in nature, the judge is immune so long as it was not taken in the complete absence of jurisdiction. *See Mireles*, 502 U.S. at 11–12, 112 S.Ct. 286; *Tucker*, 118 F.3d at 933.

■ A judge is not protected under the doctrine of judicial immunity, however, if the action in question is not judicial in nature, as when the judge performs an administrative, legislative, or executive act. *See Stump*, 435 U.S. at 360, 98 S.Ct. 1099; *Tucker*, 118 F.3d at 933. "To conclude that, because a judge acts within the scope of his authority, such ... decisions are brought within the court's 'jurisdiction,' or converted into 'judicial acts,' would lift form above substance." *Forrester*, 484 U.S. at 230, 108 S.Ct. 538. Instead, "the factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Stump*, 435 U.S. at 362, 98 S.Ct. 1099; *accord Barrett v. Harrington*, 130 F.3d 246, 255 (6th Cir.1997) ("The Supreme Court has established a two-prong test to determine whether an act is 'judicial.' First, the [c]ourt must consider whether the function is normally performed by a judge.... Second, the court must assess whether the parties dealt with the judge in his or her judicial capacity." (citation and internal quotation marks omitted)), *cert. denied*, 523 U.S. 1075, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998); *see also Cleavinger v. Saxner*, 474 U.S. 193, 201, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985)

(observing that "immunity analysis rests on functional categories, not on the status of the defendant" (citation and internal quotation marks omitted)). An act by a judicial official need not be formal for it to constitute a judicial act. *Stump*, 435 U.S. at 360, 98 S.Ct. 1099 (citing *In re Summers*, 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795 (1945)).

We do not examine the particular act at issue but the nature and function of the act; "if only the particular act in question were to be scrutinized, then any mistake of a judge in excess of his authority would become a 'non-judicial' act, because an improper or erroneous act cannot be said to be normally performed by a judge." *Mireles*, 502 U.S. at 12, 112 S.Ct. 286.

At the margins, it can be difficult to distinguish between those actions that are judicial, and which therefore receive immunity, and those that happen to have been performed by judges, but are administrative, legislative, or executive in nature. *Forrester*, 484 U.S. at 227, 108 S.Ct. 538; *cf. Cameron v. Seitz*, 38 F.3d 264, 271 (6th Cir.1994) ("Clearly, the paradigmatic judicial act is the resolution of a dispute between parties who have invoked the jurisdiction of the court. We have indicated that any time an action taken by a judge is not an adjudication between parties, it is less likely that the act is a judicial one. We have been reluctant to extend the doctrine of judicial immunity to contexts in which judicial decisionmaking is not directly involved." (citations, internal quotation marks, and alterations omitted)). "Administrative decisions, even though they may be essential to the very functioning of the courts, have not ... been regarded as judicial acts." *Forrester*, 484 U.S. at 228, 108 S.Ct. 538. For example, there is no judicial immunity for a judge's demotion and discharge of a subordinate court employee, *id.* at 229, 108 S.Ct. 538, or for

judges' promulgation as rulemakers of a code of conduct for lawyers, even though the issuance of the code was a proper function of the judges, *id.* at 228, 108 S.Ct. 538 (citing *Supreme Court of Va. v. Consumers Union of United States, Inc.,* 446 U.S. 719, 731, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980)).

By contrast, "[a] judge's direction to court officers to bring a person who is in the courthouse before him is a function normally performed by a judge. [Such a person], who was called into the courtroom for purposes of a pending case, was dealing with [the judge] in the judge's judicial capacity." *Mireles,* 502 U.S. at 12, 112 S.Ct. 286 (citing state law on the powers of state judges). A court's control of its docket is also a judicial act because it "is part of [a court's] function of resolving disputes between parties." *Rodriquez v. Weprin,* 116 F.3d 62, 66 (2d Cir.1997). And the Sixth Circuit has held that a judge performed a judicial act when he issued a report critical of a party who appeared before him, even though it "[bore] some resemblance to an administrative act," *Cameron,* 38 F.3d at 272 (citation and internal quotation marks omitted), because "[t]he report specifically addresse[d] problems directly associated with the disposi-

tion of the types of cases before [the judge's] court," *id.* In the Sixth Circuit's view, "the report was closely related to the performance of [the judge's] functions as a judge." *Id.* The court also reasoned that "[a] judge's judicial independence would be severely compromised if he could not comment on or criticize the offices supporting his own court, without fear of liability." *Id.*

### B. *Judge Corsones's and Judge Zimmerman's Assertion of Judicial Immunity*

We look to state law to determine whether Corsones and Zimmerman acted within their jurisdiction and to inform our inquiry as to whether they acted, and Huminski dealt with them, in their judicial capacities. *See Stump,* 435 U.S. at 357, 98 S.Ct. 1099.

 Under Vermont law, the Vermont state courts have jurisdiction over the security of courthouse buildings or spaces where a court is housed,[24] while the Vermont Commissioner of Buildings and General Services has responsibility for the security of the lands of such courts. *See* Vt. Stat. Ann. tit. 29, § 171.[25] Vermont

---

24. The Vermont district court, where these judges preside, is a court of general jurisdiction with regard to criminal prosecutions. *See* Vt. Stat. Ann. tit. 4, §§ 439–441. Its jurisdiction over civil actions is more limited. *See id.* § 437.

25. The statute provides in relevant part:

The commissioner of buildings and general services shall be responsible for ensuring the security of all state facilities, regardless of funding source for construction or renovation, the lands upon which those facilities are located and the occupants of those facilities and places, except that:

(1) in those state-owned or state-leased buildings which house a court plus one or more other functions, security for the space occupied by the court shall be under the

jurisdiction of the supreme court and security elsewhere shall be under the jurisdiction of the commissioner of buildings and general services;

(2) in those buildings which function exclusively as courthouses, security shall be under the jurisdiction of the supreme court; [and]

(3) the space occupied by the supreme court shall be under the jurisdiction of the supreme court[.]

Vt. Stat. Ann. tit. 29, § 171(a). Although the statute explicitly grants responsibility for courthouses only to the Vermont Supreme Court, the Vermont Supreme Court authorizes other Vermont state courts to act to "secure both the proper transaction and dispatch of business and the respect and obedience due to the court and necessary for the administra-

law also allows state courts to take certain actions to "secure both the proper transaction and dispatch of business and the respect and obedience due to the court and necessary for the administration of justice." *State v. Allen,* 145 Vt. 593, 600, 496 A.2d 168, 172 (1985) (citation, internal quotation marks, alterations, and emphasis omitted). One such approved action is summary punishment of a person for criminal contempt. *Id.; see also State v. Robinson,* 165 Vt. 351, 353, 683 A.2d 1005, 1007 (1996). Another is the exclusion of spectators from courtroom proceedings under certain circumstances. *See State v. Rusin,* 153 Vt. 36, 38–41, 568 A.2d 403, 405–06 (1989); *accord Cosentino v. Kelly,* 102 F.3d 71, 73 (2d Cir.1996) (per curiam) ("[I]t is essential to the proper administration of … justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated." (quoting *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970))), *cert. denied,* 520 U.S. 1229, 117 S.Ct. 1821, 137 L.Ed.2d 1029 (1997); *Sheppard v. Beerman,* 18 F.3d 147, 149–52 (2d Cir.) (approving of, *inter alia,* a judge's orders to a former law clerk (1) to leave the courtroom if he wished to examine documents, (2) not to go in and out of the courtroom repeatedly, and (3) to be quiet when he tried to respond to the second order), *cert. denied,* 513 U.S. 816, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994); *see also Cameron,* 38 F.3d at 271 (holding that a judge is entitled to judicial immunity for acts that exercise control over his or her courtroom (citing *Sheppard v. Maxwell,* 384 U.S. 333, 358, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966))); *Gregory v.*

*Thompson,* 500 F.2d 59, 64 (9th Cir.1974); *Snow v. Oklahoma,* 489 F.2d 278, 280 (10th Cir.1973) (per curiam).

We conclude in light of the foregoing that Corsones is immune 1) under 42 U.S.C. § 1983, from Huminski's suit insofar as it seeks injunctive relief, provided declaratory relief remains available, and she has not violated a previous declaratory judgment, and 2) under the judicially established judicial-immunity doctrine, from Huminski's suit insofar as it seeks monetary relief with respect to her role in the issuance of the May 24 and May 27 Notices.

First, Corsones did not act in the clear absence of jurisdiction. Vermont law grants its state courts the authority to ensure the security of their facilities. Judges also have substantial power to maintain the decorum and security of their courtrooms and the courthouses in which those courtrooms are located. Irrespective of her motives, which are irrelevant to this inquiry, Corsones therefore did not act in the clear absence of jurisdiction when she participated in a decision to issue to Huminski trespass notices barring him from certain state court buildings and lands, as set out in the notices.

Second, to the extent that she participated in a decision to issue the trespass notices, Corsones engaged in a judicial act because the general nature and function of her actions were substantially judicial. *See Barrett,* 130 F.3d at 257–58 (concluding that a judge was entitled to judicial immunity for actions that included letters she wrote on judicial letterhead to state and federal prosecutors requesting an investigation of the plaintiff, against whom

---

tion of justice." *State v. Allen,* 145 Vt. 593, 600, 496 A.2d 168, 172 (1985) (citation, internal quotation marks, alterations, and emphasis omitted). We therefore think it proper to

infer that the Vermont Supreme Court delegated its authority in this regard to other Vermont state courts, such as the Rutland District Court.

she had previously rendered judgment, after concerns arose for her safety based on the plaintiff's actions). There was a nexus between her actions—whether or not her actions were motivated by security and safety concerns—and Huminski's criminal case before her. Huminski's letters, complaints, and protests regarding Corsones stemmed directly and proximately from her decision to vacate his plea agreement in his criminal case over which she presided. And Corsones's actions regarding the decision to issue the trespass notices to Huminski stemmed directly from Huminski's protests. These actions by Corsones "were clearly designed to address ... [Huminski's] conduct, and directly related to her role in adjudicating the case which engendered [Huminski's] conduct in the first place." *Id.* at 259.

It is immaterial, we think, that Corsones's actions occurred outside of a courtroom inasmuch as they were directed at barring Huminski therefrom. *See id.* ("It would make little sense, and only promote form over substance, for us to say that a judge's response in redressing threatening conduct which she physically observes (e.g., contempt) is entitled to the cloak of judicial immunity, but her action in redressing a threat arising in reaction to her adjudicatory actions which she is told of by others is not entitled to the same level of immunity."). We thus agree with the Sixth Circuit: "[I]n circumstances in which a judge reasonably perceives a threat to himself or herself arising out of the judge's adjudicatory conduct, the judge's response, be it a letter to a prosecutor or a call to the Marshall's office for security, is a judicial act within the scope of judicial immunity." *Id.*

Third, Huminski's interactions with Corsones were essentially in her judicial capacity. He dealt with her while she was acting in that capacity when she presided over his criminal case. And Huminski's subsequent letters, complaints, and protests regarding the judge derived from and focused on Corsones's judicial performance in vacating his plea agreement. *See id.* at 260.

Finally, the principles underlying judicial immunity suggest that Corsones's actions should be protected. Exposing her to liability for her part in the decision to issue the trespass notices in response to Huminski's activities, which were in response to her judicial decisions in a case before her, would be inconsistent with the protection of the independence of her decisionmaking. A judge cannot be expected regularly and dispassionately to make decisions adverse to overtly hostile parties if subsequent actions to protect herself, her staff, and those in her courthouse from such hostility may result in the rigors of defending against—and even the possibility of losing—lengthy and costly litigation.[26]

We conclude, for substantially the same reasons, that Zimmerman is also entitled to judicial immunity.

The first justification for granting Corsones immunity applies equally to Zimmerman. She, too, acted pursuant to Vermont law in ensuring the security of the courthouse. She thus did not act in the clear absence of jurisdiction in issuing the Notices Against Trespass barring Huminski from the court buildings and grounds.

Second, Zimmerman's actions should be considered judicial acts insofar as there

---

**26.** *Cf.* Learned Hand, *The Deficiencies of Trials To Reach the Heart of the Matter, in* 3 Ass'n of the Bar of the City of New York, Lectures on Legal Topics 89, 105 (1926) (musing that becoming a party to a lawsuit should be "dreaded ... beyond almost anything else short of sickness and death"), *quoted in Simon DeBartolo Group, L.P. v. The Richard E. Jacobs Group, Inc.,* 186 F.3d 157, 177 (2d Cir.1999).

was a nexus between those acts and Huminski's criminal case before the state district court. The security measures she took, as a judge protecting the courthouse against a threatening litigant, which we have concluded were judicial when performed by Corsones, did not become any less judicial because the litigant previously appeared before a different judge. This is particularly so here, where the litigant in question forced the original judge who presided at his trial to recuse herself by filing complaints about the type of conduct that lies at the heart of the judicial function.

Third, and again following our analysis regarding Corsones, Zimmerman's actions with regard to Huminski were essentially in her judicial capacity. Once Corsones removed herself from the situation to avoid a potential conflict, it was likely that another judge would step in. Zimmerman's actions in this matter were thus entirely an outgrowth of her duties as a judge. Zimmerman, too, is thus immune.

Finally, there is some doubt whether Zimmerman was acting in Corsones' place when Zimmerman signed the May 27 Notice Against Trespass. We do not, however, endorse a rule under which a judge who dealt with proceedings involving a vexatious litigant would receive judicial immunity, but another judge called upon to intercede and replace the original judge with respect to the matter could not do so without exposing herself to suit and possible liability. The principles underlying judicial immunity, we think, would require that such a second judge be equally protected with the first.

### IV. *The Alleged First Amendment Violations*

Viewing the facts in the light most favorable to Huminski, the district court denied the motions by Judge Corsones, Judge Zimmerman, and Karen Predom for summary judgment with respect to Huminski's claims that his First Amendment right of access to the Rutland courthouses to attend court proceedings and his First Amendment right to free expression were violated by the defendants. The court so ruled on the basis that there were genuine issues of material fact as to whether the trespass notices issued to Huminski were viewpoint neutral. The court nonetheless granted Sheriff Elrick's motion for summary judgment with regard to these claims because it concluded that Elrick could not have engaged in viewpoint discrimination.

■ The remaining defendants argue that they are entitled to qualified immunity with respect to Huminski's First Amendment claims for damages because (1) Huminski did not suffer a deprivation of his First Amendment rights as a result of the issuance and service of the trespass notices because they were motivated strictly by security concerns and because he suffered no actual injury as a result, and (2) the defendants did not violate any clearly established constitutional right. We have concluded that Corsones and Zimmerman are entitled to judicial immunity. It is therefore not necessary for us to decide whether they are also protected by qualified immunity. We discuss their qualified immunity, however, in the course of considering whether Predom, who is not protected by judicial immunity, is qualifiedly immune.[27]

27. We think that Huminski's claims are ripe for our review despite the argument made by some of the defendants (1) that Huminski has not suffered any demonstrable injury from the trespass notices because no criminal action has been commenced against him based on them and (2) that he has he not yet been denied access to courthouse grounds on the basis of the notices. "[I]n the First Amendment context, the ripeness doctrine is some-

■ "The doctrine of qualified immunity shields government officials from liability for damages on account of their performance of discretionary official functions insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known." *Shechter v. Comptroller of the City of New York,* 79 F.3d 265, 268 (2d Cir.1996) (citation and internal quotation marks omitted); *see also Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (noting that defendants are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

To be entitled to qualified immunity, the defendants therefore have the burden of proving, first, that their conduct fell within the scope of their official duties. *Shechter,* 79 F.3d at 268. It is undisputed that it did. Second, the defendants must establish that their conduct did not violate clearly established constitutional rights that Huminski enjoyed and of which a reasonable person would have known. *See id.* at 269. Given the present procedural stance, in evaluating this second step, we first consider whether, construing the evidence in the light most favorable to Huminski, there is a genuine issue of material fact as to whether the defendants violated Huminski's constitutional rights. *See Saucier v.*

*Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If there is such a genuine issue of material fact that, if decided in favor of Huminski, would establish a violation of one of his constitutional rights, we must then address the extent to which the right may have been clearly established at the time of the defendants' acts in question. *See id.*

### A. Right of Access to Courts

■ 1. *The Right of Access to Judicial Proceedings.* The Constitution affords at least two bases for a right of access to courtrooms, judicial proceedings, and judicial records. One is grounded in the Sixth Amendment right to a public trial, the other in the First Amendment rights of freedom of speech and of the press.[28]

■ The Sixth Amendment guarantees a defendant in a criminal case the right to a public trial principally to protect the defendant from prosecutorial and judicial abuses by permitting contemporaneous public review of criminal trials. *See Waller v. Georgia,* 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); *Gannett Co. v. DePasquale,* 443 U.S. 368, 379–80, 387, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). It does not, however, provide a constitutional right to members of the public to attend a trial or insist upon a public trial for someone else. *See Gannett Co.,* 443 U.S. at 391, 99 S.Ct. 2898. The rights protected by the

---

what relaxed." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 90 (2d Cir.2002). As contrasted with a typical fear of enforcement of a general law or regulation, the issuance of personalized trespass notices to Huminski gives rise to a non-speculative alleged injury. *Cf. Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) ("We do not doubt that hostile action toward a litigant could be so offensive as to effectively drive the litigant out of a courthouse and thereby become the functional equivalent of a

denial of access."), *cert. denied,* 525 U.S. 823, 119 S.Ct. 66, 142 L.Ed.2d 52 (1998).

**28.** "The Due Process Clause also requires the States to afford certain civil litigants a meaningful opportunity to be heard by removing obstacles to their full participation in judicial proceedings." *Tennessee v. Lane,* — U.S. ——, 124 S.Ct. 1978, 1988, 158 L.Ed.2d 820 (2004) (citation and internal quotation marks omitted). Huminski, however, had no civil litigation business at the Rutland courthouses during the events at issue.

Sixth Amendment are therefore not ones that Huminski attempted to assert, or likely could have asserted, in the context of this case.

Huminski does, however, have a viable claim under the First Amendment as applied to the State of Vermont through the Fourteenth. "For many centuries, both civil and criminal trials have traditionally been open to the public." *Id.* at 386 n. 15, 99 S.Ct. 2898; *see also Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 580 n. 17, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Publicker Indus., Inc. v. Cohen,* 733 F.2d 1059, 1066, 1068–70 (3d Cir.1984) (detailing the history of public access to civil trials and records). This has been so in this country from the time of its founding, and both here and in England during Colonial times. *See Richmond Newspapers, Inc.,* 448 U.S. at 565–69, 100 S.Ct. 2814 (criminal trials); *Publicker Indus., Inc.,* 733 F.2d at 1066, 1068–70 (civil trials and records). "This is no quirk of history; rather, it has long been recognized as an indispensable attribute of an Anglo–American trial." *Richmond Newspapers, Inc.,* 448 U.S. at 569, 100 S.Ct. 2814.

The law plays a pervasive role in our society, and the trial is its most visible manifestation. Where for lawyers the law is found in the reporters, treatises, and statutes, for the public the epitome of legal drama is the trial. Celebrated trials compete for space in the newspapers, inspiring countless repetitions and revisions in novels, on television, and in the movies. For the general public it is in these cases ... that the law itself is on trial, quite as much as the cause which is to be decided. Holding court in public thus assumes a unique significance in a society that commits itself to the rule of law.

Note, *Trial Secrecy and the First Amendment Right of Public Access to Judicial Proceedings,* 91 Harv. L.Rev. 1899, 1923 (1978) (footnotes, alterations, and internal quotation marks omitted) [hereinafter *Trial Secrecy* ]. Therefore,

there is a strong societal interest in public trials. Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system.

*Gannett Co.,* 443 U.S. at 383, 99 S.Ct. 2898; *accord Richmond Newspapers, Inc.,* 448 U.S. at 569, 100 S.Ct. 2814; *Westmoreland v. Columbia Broadcasting Sys., Inc.,* 752 F.2d 16, 23 (2d Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3478, 87 L.Ed.2d 614 (1985); *Publicker Indus., Inc.,* 733 F.2d at 1070; *cf. Waller,* 467 U.S. at 46, 104 S.Ct. 2210 (discussing the value of openness in the context of the Sixth Amendment right to a public trial). Such openness to the public can also "foster[ ] an appearance of fairness," *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), and thereby "boost[ ] community trust in the administration of justice," *Brown v. Artuz,* 283 F.3d 492, 498–99 (2d Cir.2002); *accord Publicker Indus., Inc.,* 733 F.2d at 1070 ("Public proceedings are the means by which [a] testimonial of trustworthiness is achieved.").

A result considered untoward may undermine public confidence, and where the trial has been concealed from public view an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted. To work effectively, it is important that society's [judicial] process satisfy the appearance of justice, and the appearance of justice can best be provided by allowing people to observe it.

*Richmond Newspapers, Inc.,* 448 U.S. at 571–72, 100 S.Ct. 2814 (citation and internal quotation marks omitted). And when the "theatre of justice," *Trial Secrecy, supra,* at 1923 (internal quotation marks and footnote omitted), does not progress or end consistently with what a member of the public, or public opinion at large, deems proper, citizens can attempt to initiate reform. *Id.*[29]

 Based on the history and purposes of maintaining public access to court proceedings, "a presumption of openness inheres in the very nature of a ... trial under our system of justice." *Richmond Newspapers, Inc.,* 448 U.S. at 573, 100 S.Ct. 2814. Therefore, "the right to attend criminal trials is implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and of the press could be eviscerated." *Id.* at 580, 100 S.Ct. 2814 (citation and internal quotation marks omitted). We too have held that "the First Amendment ... secure[s] to the public and to the press a right of access to civil proceedings." *Westmoreland,* 752 F.2d at 22 (reviewing the caselaw with the introductory comment, "There is, to be sure, an abundance of support in the cases for a constitutionally grounded public right of access to the courtroom."); *accord Hartford Courant Co. v. Pellegrino,* 371 F.3d 49, 57 (2d Cir. 2004) (applying principles of First Amendment rights of access to courts to conclude that there is a "qualified First Amendment right to inspect [civil] docket sheets, which provide an index to the records of judicial proceedings"); *Publicker Indus., Inc.,* 733 F.2d at 1061 ("We hold that the First Amendment does secure a right of access to civil proceedings.").[30]

 2. *The Individual's Right of Access to the Courts.* Both the Supreme Court and this Court have with some frequency articulated principles regarding the First Amendment right of access to court proceedings and papers. But, remarkably, the parties do not point us to, nor have we ourselves found, a Supreme Court or Second Circuit opinion that has discussed this right in the context of the exclusion of an identified individual member of the public or press, rather than the barring of the public or the press at large, from court proceedings to which that individual is not a party. *Cf. Beerman,* 18 F.3d at 152 (concluding, in the context of a suit claiming that a single individual was denied access to criminal proceedings in violation of the First Amendment, that the individu-

29. Although an argument might be crafted that putative gadfly Huminski is an example of the "lonely pamphleteer" with a claim on "liberty of the press" posited by Justice White in *Branzburg v. Hayes,* 408 U.S. 665, 704, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), we make no distinction in our analysis between those who can legitimately assert that they are entitled to protection under the First Amendment's press clause and those who cannot.

30. Although the Supreme Court has not yet ruled on the applicability of the constitutional presumption of access to civil cases, in *Richmond Newspapers,* where the Court first clearly recognized a First Amendment right of access to courts, six of the eight sitting Justices clearly implied that the right applies to civil cases as well as criminal ones. *See Richmond Newspapers, Inc.,* 448 U.S. at 580 n. 17, 100 S.Ct. 2814 (Burger, C.J.) (plurality opinion) ("Whether the public has a right to attend trials of civil cases is a question not raised by this case, but we note that historically both civil and criminal trials have been presumptively open."); *id.* at 596, 100 S.Ct. 2814 (Brennan, J., concurring in the judgment) (referring to the value of open proceedings in civil cases); *id.* at 599, 100 S.Ct. 2814 (Stewart, J., concurring in the judgment) ("[T]he First and Fourteenth Amendments clearly give the press and the public a right of

al was not denied access, and therefore having no need to determine whether the right of access covered the exclusion of an individual). We have no doubt, nonetheless, that an identified non-party such as Huminski who is denied access to court has and can assert a presumed right of access even if he or she is the only person excluded.[31]

First, the rights accorded by the First Amendment provide quintessential protection for the individual. In fashioning principles of access rights to the courts under the First Amendment, the Supreme Court has therefore apparently assumed that such rights are personal and may be asserted by an identified excluded individual. *See, e.g., Globe Newspaper Co.*, 457 U.S. at 603–04, 102 S.Ct. 2613 ("The Court's recent decision in *Richmond Newspapers* firmly established for the first time that the press and general public have a constitutional right of access to criminal trials.... By offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government."); *Richmond Newspapers, Inc.*, 448 U.S. at 600, 100 S.Ct. 2814 (Stewart, J., concurring in the judgment) (describing "the [qualified] First Amendment right of members of the public and representatives of the press to attend civil and criminal trials"); *see also Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 508, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) ("*Press–Enterprise I* ")

(speaking of "the [First Amendment] right of everyone in the community to attend the *voir dire* " portion of a criminal trial).

Second, the exclusion of any person undermines right-of-access principles in much the same way, if not to the same extent, as a blanket denial of access does: You cannot "foster[ ] an appearance of fairness," *Globe Newspaper Co.*, 457 U.S. at 606, 102 S.Ct. 2613, thereby "boost[ing] community trust in the administration of justice," *Brown*, 283 F.3d at 498–99,·unless any member of the public—not only members of the public selected by the courts themselves—may come and bear witness to what happens beyond the courtroom door.

A person singled out for exclusion from the courtroom, who is thereby barred from first-hand knowledge of what is happening there, moreover, is placed at an extraordinary disadvantage in his or her attempt to compete in the "marketplace of ideas" about the conduct of judges and the judicial system. *Cf. Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir.1986) (holding that a district court's order protecting discovery materials from public disclosure with a limited exception for the producers of a particular television program violates other press outlets' First Amendment rights because "[a] court may not selectively exclude news media from access to information otherwise made available for public dissemination"); *Am. Broadcasting Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d

access to trials themselves, civil as well as criminal.").

**31.** *Posr v. Court Officer Shield # 207*, 180 F.3d 409 (2d Cir.1999), is not to the contrary. Although we said there that "the right of access to the courts has been interpreted to belong solely to litigants or those seeking to be litigants, and a plaintiff may state a claim for denial of access only if the defendant's actions hindered the pursuit of a legal claim," *id.* at 414 (rejecting the claim of a plaintiff who was denied access to courtroom proceed-

ings as an observer) (citing *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir.1997), *cert. denied*, 525 U.S. 823, 119 S.Ct. 66, 142 L.Ed.2d 52 (1998)), the statement was made with regard to other bases for a right of access—such as the Sixth Amendment right of access, a First Amendment right to petition for redress, a right of access under the Privileges and Immunities Clause of Article IV, section 2, or the Due Process Clauses of the Fifth and Fourteenth Amendments—not the First Amendment right of access.

Cir.1977) (holding, in a case involving the exclusion of a single television news network from live coverage of New York City post-mayoral Democratic Party primary runoff activities at the candidates' headquarters, that "once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable"); *Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C.Cir.1977) (stating in the context of a challenge to the issuance of White House press passes as arbitrary or content-based in violation of the First Amendment, that "[n]ot only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on news gathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information").

Exclusion of an individual reporter also carries with it "[t]he danger [that] granting favorable treatment to certain members of the media ... allows the government to influence the type of substantive media coverage that public events will receive," which effectively harms the public. *Anderson*, 805 F.2d at 9; *see also Cuomo*, 570 F.2d at 1083 ("If choice were allowed for discrimination in a public event ... in the various media, then we reject the contention that it is within the prerogative of a [government official]. We rather think that the danger would be that those of the media who are in opposition or who the [official] thinks are not treating him fairly would be excluded. And thus we think it is the public which would lose."). "Neither the courts nor any other branch of the government can be allowed to affect the content or tenor of the news by choreographing which news organizations have

access to relevant information." *Anderson*, 805 F.2d at 9.

Finally, as the names of the cases in which the principles of access to courtrooms and court records have emerged demonstrate, the system of public justice depends on the willingness and ability of individual persons and entities to police the system by seeking access—through litigation if necessary—to courtrooms and court records that have been closed. Such a plaintiff cannot be expected to act out of pure altruism; access will likely be sought at least in part for the plaintiff's own purposes: in the case of a press organization, to obtain news and information for *its* dissemination to *its* audience. It seems doubtful to us, for example, that the Press–Enterprise Company would have litigated two court-access cases through the California court system to the Supreme Court, *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) ("*Press–Enterprise II* "), and *Press–Enterprise I*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629, unless there was a possibility that its publications' readers would benefit from information that might become publicly available as a result, or that NBC would have litigated access to the "Abscam" tapes in this Court without the expectation that, if successful, the network itself would be able to broadcast them, *see In re Nat'l Broadcasting Co.*, 635 F.2d 945, 949 (2d Cir.1980) (relying on the common-law right of access to inspect and copy judicial records). The mechanism on which we rely to keep courts open thus depends on maintaining a motivation for private parties to seek access to courts through litigation by ensuring that a person who or entity that establishes openness obtains the benefit of it.

Huminski, we therefore conclude, had and has a presumed right of access to the

state courthouses in Rutland.[32]

We note that the United States Court of Appeals for the Tenth Circuit seems to have suggested a different outcome in *United States v. McVeigh*, 106 F.3d 325, 335–36 (10th Cir.1997) (per curiam), in which that court stated that "pertinent constitutional proscriptions are implicated only when, through orders closing proceedings, sealing documents, gagging participants and/or restricting press coverage, a trial court has deprived the public at large direct or indirect access to the trial process," *id.* at 336. That case, however, addressed a challenge to a witness-sequestration order preventing some of the victims of the Oklahoma City bombing (who were also witnesses) from attending the criminal trial, and thus presented a court access issue distinct from the one now before us. The court there specifically noted that it did not "need [to and did] not address entirely distinct questions regarding the propriety and redress of trial exclusions implicating other constitutional values, such as equal protection or traditional free speech guarantees." *Id.* at 335 n. 9. We thus conclude that the *McVeigh* decision is not in conflict with our decision that Huminski can assert an individual right of access to the courts because the First Amendment interest at issue here was not addressed by that court.

■ 3. *Overcoming the Presumption of Access.* What is called the "right" of access is, however, only a presumption of access. The Supreme Court has established the standard for measuring the constitutional propriety of a judicial court closure at the behest of a party to the

proceedings despite the existence of that presumption.

> [T]he circumstances under which the press and public can be barred from a ... trial are limited; the State's justification in denying access must be a weighty one.... [I]t must be shown that the denial is necessitated by a compelling ... interest, and is narrowly tailored to serve that interest.

*Globe Newspaper Co.*, 457 U.S. at 606–07, 102 S.Ct. 2613 (criminal trial); *see also Press–Enterprise II*, 478 U.S. at 10, 106 S.Ct. 2735 (preliminary hearing); *Press–Enterprise I*, 464 U.S. at 505, 510, 104 S.Ct. 819 (*voir dire*). "The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. 819. "Broad and general findings by the trial court ... are not sufficient to justify closure." *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir.1987), *cert. denied*, 485 U.S. 977, 108 S.Ct. 1272, 99 L.Ed.2d 483 (1988). We have decided that to establish a compelling interest in the course of court proceedings, the movant must demonstrate "a substantial probability of prejudice to a compelling interest of the defendant, government, or third party, which closure would prevent," *United States v. Doe*, 63 F.3d 121, 128 (2d Cir.1995) (footnote and citation omitted), including "the defendant's right to a fair trial; privacy interests of the defendant, victims or other persons; the integrity of significant government activities entitled to confidentiality, such as ongoing undercover investigations or detection devices; and danger to persons or property," *id.* (citations, internal quotation marks, and

---

**32.** Given the language of the trespass notices here at issue, we think that, contrary to the district court and in accordance with the views of the Bennington Superior Court, the trespass notices reached only to the state courthouses in Rutland, and not to all state courthouses in Vermont. Were we to adopt a broader construction of the scope of the trespass notices, however, it would not affect our analysis.

alterations omitted). The quantum of prejudice that the movant must show increases the more extensive the closure sought would be. *Id.* at 129. "When limited closure ... is at issue, the prejudice asserted need only supply a substantial reason for closure. When the closure sought is total or nearly so, the district court must find the prejudice to be overriding." *Id.* (internal quotation marks omitted).

█ A court must, moreover, "consider whether alternatives were available to protect the interests of the [persons] that the ... court's orders sought to guard" for a closure to be found constitutional. *Press–Enterprise II,* 464 U.S. at 511, 104 S.Ct. 819; *see also Doe,* 63 F.3d at 128. "[I]f such alternatives are found wanting, the district court should determine whether, under the circumstances of the case, the prejudice to the compelling interest overrides the qualified First Amendment right of access." *Id.* (citation and internal quotation marks omitted).

█ Finally, when it is a court that determines "that closure is warranted, it should devise a closure order that, while not necessarily the least restrictive means available to protect the endangered interest, is narrowly tailored to that purpose." *Id.* (citations omitted); *cf. ABC, Inc. v. Stewart,* 360 F.3d 90, 105 (2d Cir.2004) ("We ... do not think that, to the extent that there was a constitutionally recognized basis for closure, the district court chose the most narrowly tailored course available.").

To resolve this appeal, we must therefore determine what demonstration the defendants were required to make to overcome Huminski's presumption of access. We conclude that the showing was not a burdensome one in these circumstances.

As we have noted, "[w]hen limited closure ... is at issue, the prejudice asserted

need only supply a 'substantial reason' for closure." *Doe,* 63 F.3d at 129. In this case, closure might be viewed as limited inasmuch as it extends to a single person. And we think it self-evident that the Rutland District Court has a legitimate countervailing interest of the highest order: to protect persons, property, and judicial proceedings. *See, e.g., Beerman,* 18 F.3d at 152 ("Clearly, [a judge is] entitled to exercise his discretion in keeping decorum in his courtroom."); *Trial Secrecy, supra,* at 1912 (observing that a court has "a valid interest [simply] in ensuring that its proceedings [are] conducted with a measure of dignity and order" (citing *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970))). To serve that interest adequately, court administrative, judicial, and other officials must at least have the ability to close the courtroom door to any person whom they reasonably think may pose a threat to person, property, or decorum. A potential spectator may be excluded from a courtroom on a simple issue of propriety: reasonably unacceptable dress, unruly behavior, efforts inappropriately to communicate views in the courtroom, possession of personal property banned from the court (e.g., cell phones, cameras, or recording devices), and the like. And even the best behaved and least objectionable person seeking admittance may be barred from a courtroom for mundane practical reasons, such as the physical capacity of the courtroom in question. Similarly, exclusion of identified individuals in pursuit of a greater flow of information to the public, for example, by preferring in some general way court admission for members of the "press," is likely to pass constitutional muster.

Plainly, though, closing the courtroom door must in fact be substantially motivated by such an appropriate consideration. A professed security concern cannot, for

example, be used to mask an improper reason for closing the courtroom door, most particularly aversion to the views of the person who seeks access. Avoidance of such viewpoint discrimination is, of course, at the heart of much First Amendment protection. *See, e.g., Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Indeed, this concern is not clearly absent from the events that transpired at the Rutland courthouse in the instant case, as the district court observed. *See Huminski III,* 211 F.Supp.2d at 529–31.

We also think that the requirement that the reasons for an official's denial of access to a member of the public or press to the courtroom "be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered," *Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. 819, may be dispensed with when the imminence of the threat or other circumstances do not reasonably permit it. When a judge, in the relative calm of chambers, issues such an order, for example, the requirement of particularized findings obtains. In that context, findings are a necessary safeguard against arbitrary judicial abridgement of the constitutional right. But when the decision is made by an administrative or law-enforcement officer in the lobby of a courthouse, adherence to what in those circumstances would be the anomalous formality of particularized findings cannot reasonably be expected.

We need not, however, determine the precise boundaries of constitutionally appropriate official behavior here. For there is, in addition to the requirements that the reasons for exclusion be constitutionally appropriate and that there be findings at least in some circumstances, a requirement that restrictions on court access be "narrowly tailored" to meet the reasons for closure. *Globe Newspaper Co.,* 457 U.S. at 606–07, 102 S.Ct. 2613.

We assume for these purposes that the defendants were justified in barring Huminski from the Rutland District Court courthouse on the morning of May 24, 1999. And in the context of daily efforts to protect the safety and operations of courts, we understand that "narrow tailoring" will not necessarily meet the standards of Savile Row. But here, there was virtually no "tailoring" at all. The means the Vermont officials chose to safeguard the courts from whatever threat they may have reasonably feared from Huminski were wildly disproportionate to the perceived threat.

The Notices Against Trespass bar Huminski from the state courthouses of Rutland and their grounds indefinitely and virtually completely. As far as we can tell, with at most an exception for litigation to which Huminski is a party, he cannot ever attend *any* criminal or civil proceedings there. Because the exclusion effected by the trespass notices was plainly overbroad in light of its duration, geographical scope, and scope of proceedings covered, we conclude that the exclusion was not "tailored" to the threat and is therefore unconstitutional. *Cf. Gannett Co.,* 443 U.S. at 393, 99 S.Ct. 2898 (concluding that a trial closure did not violate the First Amendment in part because denial of access was merely temporary and the public could therefore subsequently attend trial); *Bowden v. Keane,* 237 F.3d 125, 129–30 (2d Cir.2001) ("Whether a closure is deemed broad or narrow [in the context of the Sixth Amendment] depends on a number of factors, including its duration; whether the public can learn (through transcripts, for example) what transpired while the trial was closed; whether the evidence presented during the courtroom closure was essen-

tial, or whether it was merely cumulative or ancillary; and whether selected members of the public were barred from the courtroom, or whether all spectators were precluded from observing the proceedings." (citations omitted)).[33]

■■■■■ 4. *Qualified Immunity.* We conclude, however, that the defendants are entitled to qualified immunity with respect to this closure. At the time that the Notices Against Trespass were issued to Huminski, his personal right of access was not clearly established. A right is "clearly established" if its "contours ... [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (citation omitted). That is, the right must be defined with "reasonable specificity." *Shechter,* 79 F.3d at 271 (citation and internal quotation marks omitted). In performing this analysis, we look to the established law of the Supreme Court and of this Court at the time of the defendants' actions. *See id.*

We have pointed out at some length why it is clear to us that Huminski had a personal right of access to the Rutland courts. We have also noted, however, that we can find no Supreme Court or previous Second Circuit authority that actually decides this issue and thereby establishes that the First Amendment right of access to judicial proceedings or courthouses is violated when one identified person, rather than the public or press at large, is excluded from judicial proceedings.[34] The defendants therefore are not liable for damages to Huminski for their violation of his First Amendment right of access and, to that extent, the district court erred in denying their motion for summary judgment.

Although not on appeal here, given the foregoing considerations, we urge the district court upon remand to reconsider its denial of summary judgment to Huminski for violation of his First Amendment right of access with regard to declaratory and permanent injunctive relief. *See African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002) (holding that

---

33. We do not, in the foregoing analysis, mean to imply any change in our rules applicable to access to sealed documents as reflected in, for example, *Gambale v. Deutsche Bank AG,* 377 F.3d 133 (2d Cir.2004).

34. We find it instructive that at the time of the events in Rutland in 1999, *Posr v. Court Officer Shield # 207,* 180 F.3d 409 (2d Cir.1999), was pending in this Court. There, we affirmed a 1998 decision of the United States District Court for the Eastern District of New York dismissing a complaint involving events strikingly similar to those before us: The plaintiff had been turned away from a state courthouse by a security guard. We said that "the right of access to the courts has been interpreted to belong solely to litigants or those seeking to be litigants, and a plaintiff may state a claim for denial of access only if the defendant's actions hindered the pursuit of a legal claim." *Id.* at 414. To be sure, in retrospect, the observation was made in response to the assertion of claims other than a First Amendment right-of-access claim. *See supra* note [30]. But reading that opinion and considering the decision of the district court upon which it was based, we cannot conclude that, in May 1999, when Huminski was banned from the Rutland courts, his personal right of access to a courtroom was clearly enough established that the defendants in this case should have acted consistently with it. In other words, assessing the defendants' behavior against the state of the law at the time, the right of access Huminski asserts was not clearly established such that "a reasonable person would have known" of it. *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727.

qualified immunity is not a defense to injunctive relief). Before considering a renewed motion for summary judgment, the district court would be free to consider also whether, in the circumstances, granting any request for additional discovery would be appropriate.

### B. *Right of Free Expression*

Huminski complains of the restrictions that the Notices Against Trespass place on his ability to express himself in and about the Rutland courthouse. We think that the district court properly denied the motions of Corsones, Zimmerman, and Predom seeking summary judgment on this claim on the ground of qualified immunity. We also conclude, after viewing the facts in the light most favorable to the defendants, that the district court erred in deciding that the trespass notices constituted a reasonable restriction on Huminski's expressive activity.

■ 1. *Forum Analysis.* In determining whether the First Amendment protects particular speech on government property, we must first examine the nature of the forum in which the speaker's speech is restricted. Forums may be public, either by tradition or by designation, or nonpublic. The category of the forum determines the appropriate test for weighing "the Government's interest in limiting the use of its property to its intended purpose [against] the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

■ "Traditional public fora are those places which by long tradition or by government fiat have been devoted to assembly and debate." *Id.* at 802, 105 S.Ct. 3439 (citation and internal quotation marks omitted). Therefore, " 'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.' " *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). A government may also affirmatively designate property as a public forum "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. "Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Id.* at 800, 105 S.Ct. 3439; *see also United States v. Kokinda,* 497 U.S. 720, 726, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (strictly scrutinizing restraints on speech in public forums). The same holds true for a forum which, although not traditionally public, has been designated by the government as a public forum. *Kokinda,* 497 U.S. at 726–27, 110 S.Ct. 3115.

However, "[w]e will not find that a public forum has been created in the face of clear evidence of a contrary intent, nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." *Cornelius,* 473 U.S. at 803, 105 S.Ct. 3439 (citation omitted). "Governmental intent is said to be the touchstone of forum analysis." *Gen. Media Communications, Inc. v. Cohen,* 131 F.3d 273, 279 (2d Cir.1997) (citation and internal quotation marks omitted), *cert. denied,* 524 U.S. 951, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998).

> Publicly owned or operated property does not become a "public forum" simply because members of the public are permitted to come and go at will. Although whether the property has been generally

opened to the public is a factor to consider in determining whether the government has opened its property to the use of the people for communicative purposes, it is not determinative of the question.

Grace, 461 U.S. at 177, 103 S.Ct. 1702 (citation and internal quotation marks omitted); *see also Knolls Action Project v. Knolls Atomic Power Lab.,* 771 F.2d 46, 49 (2d Cir.1985) (rejecting the assertion "that whenever government attempts to accommodate the desires of a speaker by not enforcing its maximum legal rights to exclude the public from certain property, it forever forfeits those rights"). We are particularly reluctant to conclude that government property is a public forum "where the principal function of the property would be disrupted by expressive activity." *Cornelius,* 473 U.S. at 804, 105 S.Ct. 3439; *cf. Adderley v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) ("The State ... has power to preserve the property under its control for the use to which it is lawfully dedicated.").

▪ In a forum that is not for either reason public, governmental restrictions on expressive conduct or speech are constitutional so long as they are reasonable in light of the use to which the forum is dedicated and "are not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439 (citation, internal quotation marks, and alterations omitted). Reasonableness "must be assessed in light of the purpose of the forum and all the surrounding circumstances." *Id.* at 809, 105 S.Ct. 3439. "The existence of reasonable grounds for limiting access to a nonpublic forum ... will not save a regulation that is in reality a facade for viewpoint-based discrimination." *Id.* at 811, 105 S.Ct. 3439.

Measuring the facts of this case against these principles, we conclude that insofar as the trespass notices exclude Huminski from Rutland's courthouses, court lands, and parking lots [35] and to the extent that his communications were banned from other than public sidewalks, streets, or parks, *see Grace,* 461 U.S. at 177, 103 S.Ct. 1702, he was excluded from nonpublic forums. The building housing the Rutland District Court is a nonpublic forum. There is no genuine issue of material fact whether the court has traditionally been held open to the public for expressive activities or whether the state has so designated it— the court has not. The fact that "the public is admitted to the building during specified hours," *id.* at 178, 103 S.Ct. 1702, as it doubtless was in Rutland, does not render it a public forum. "[Courts have] not been traditionally held open for the use of the public for expressive activities." *Id.* (holding that the Supreme Court building and its grounds other than public sidewalks are not public forums).

The function of a courthouse and its courtrooms is principally to facilitate the smooth operation of a government's judicial functions. A courthouse serves

> to provide a locus in which civil and criminal disputes can be adjudicated. Within this staid environment, the presiding judge is charged with the responsibility of maintaining proper order and decorum. In carrying out this responsibility, the judge must ensure that the courthouse is a place in which rational reflection and disinterested judgment will not be disrupted.... [T]he proper

---

**35.** As in our discussion of the right of access to court proceedings, we assume that the trespass notices extend only to the Rutland state courthouses and their grounds, rather than to state government buildings and lands statewide. It would not, however, fundamentally alter our analysis if the notices encompassed all state courthouses and their grounds.

discharge of these responsibilities includes the right (and, indeed, the duty) to limit, to the extent practicable, the appearance of favoritism in judicial proceedings, and particularly, the appearance of political partiality.

*Berner v. Delahanty,* 129 F.3d 20, 26 (1st Cir.1997) (citations and internal quotation marks omitted), *cert. denied,* 523 U.S. 1023, 118 S.Ct. 1305, 140 L.Ed.2d 470 (1998); *cf. Greer v. Spock,* 424 U.S. 828, 838 & n. 10, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (holding that a military installation is not a public forum because its business is to train soldiers, even if civilian speakers and entertainers were sometimes invited to appear at the installation). These purposes are likely to be incompatible with expressive activities inside a courthouse. Other courts have concluded on this basis that the interior of a courthouse is not a public forum. *See Grace,* 461 U.S. at 178–80, 103 S.Ct. 1702 (involving Supreme Court building and grounds); *Sammartano v. First Judicial Dist. Court,* 303 F.3d 959, 966 (9th Cir.2002) (holding that judicial and municipal complexes are nonpublic forums); *Sefick v. Gardner,* 164 F.3d 370, 372 (7th Cir.1998) ("The lobby of the [federal] courthouse is not a traditional public forum or a designated public forum, not a place open to the public for the presentation of views. No one can hold a political rally in the lobby of a federal courthouse. It is a nonpublic forum . . . ." (citation and internal quotation marks omitted)), *cert. denied,* 527 U.S. 1035, 119 S.Ct. 2393, 144 L.Ed.2d 794 (1999); *Berner,* 129 F.3d at 26 ("A courthouse—and, especially, a courtroom—is a nonpublic forum."); *United States v. Gilbert,* 920 F.2d 878, 884 (11th Cir.1991) (holding that although a courthouse was a nonpublic forum, the unenclosed courthouse plaza was a designated public forum). We agree.

We conclude, moreover, that Huminski has not shown that the parking lots adjacent to the courthouse (and the courthouse grounds generally) are public forums. *Cf. Knolls Action Project,* 771 F.2d at 50 (rejecting a claim that the parking lot of a classified nuclear laboratory facility was a public forum). Other than abutting public streets and sidewalks, the parking lots do not fall within the class of traditional public forums—they are not "historically associated with the free exercise of expressive activities," as are "streets, sidewalks, and parks." *Grace,* 461 U.S. at 177, 103 S.Ct. 1702. Nor is there any genuine issue of material fact as to whether Vermont did anything to designate the parking lots as public forums. It did not. The evidence before us uniformly indicates that these parking lots, with their marked spaces for automobiles, serve as a convenient space for the courthouse staff and visitors to park their vehicles. Inasmuch as they are adjacent to the courthouse, moreover, the reasons that lead us to conclude that the purposes of the courthouse are not compatible with those of expressive activities suggest to us, if less powerfully, that there are various kinds of expressive activities that, if conducted in these lots, might well interfere with courts' attendance to their business.

Huminski argues unpersuasively that the parking lots are public forums because some of the motor vehicles within the lots have bumper stickers affixed to them endorsing political candidates. There is no showing that permitting these stickers to be in a parking facility reflects an affirmative intent of the state government to designate the lot as a public forum. Furthermore, as the district court correctly reasoned, the fact that Huminski has been able to engage in political protest on the grounds of the Bennington District Court or that some other protests took place adjacent to other state court facilities is not sufficient evidence of Ver-

mont's intent to open all its courthouse grounds to public expression. *Huminski III*, 211 F.Supp.2d at 538 ("[T]he presence of some expressive activity in a forum does not, without more, render it a public forum." (quoting, *inter alia, Gen. Media Communications, Inc.*, 131 F.3d at 279)).

We therefore analyze the constitutionality of the restrictions in the trespass notices as applied to nonpublic forums by determining whether the notices constitute reasonable restrictions of expressive activity and are viewpoint neutral.

2. *Reasonableness.* The restrictions on Huminski's expression, in this case by the Notices Against Trespass, "need only be reasonable in light of the purpose of the forum and reflect a legitimate government concern." *Gen. Media Communications, Inc.*, 131 F.3d at 282 (citations omitted). They "need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808, 105 S.Ct. 3439.

■ Chief among the reasons that incline us toward the view, contrary to the district court's, that the restrictions here in issue do *not* meet the test for reasonableness is the fact that they were incorporated into the far-reaching Notices Against Trespass. As distinct from a generally applicable municipal ordinance and like an injunction, the notices "carry greater risks of censorship and discriminatory application than do general ordinances. There is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally." *Madsen v. Women's Health Ctr., Inc.*, 512

U.S. 753, 764, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (requiring "a somewhat more stringent application of general First Amendment principles in" the context on an injunction (citation, internal quotation marks, and alterations omitted)). We must therefore pay especially "close attention to the fit between the objectives of [the notices] and the restrictions [they] impose[ ] on speech." *Id.* at 765, 114 S.Ct. 2516.

The Notices Against Trespass in effect prohibit indefinitely any and all expressive activity in which Huminski might want to engage in and around Rutland state courthouses. These notices are thus pervasive enough to be viewed as creating a "First–Amendment–Free Zone" for Huminski alone in and around the Rutland courts. The defendants' singling out of Huminski for exclusion, thereby permitting all others to engage in similar activity in and around the courts, suggests to us that the trespass notices are not reasonable. Such broad restrictions are generally frowned upon even in nonpublic forums. *Cf. Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 575, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987) ("We think it obvious that . . . a ban [on First Amendment activities at an airport] cannot be justified even if [the airport] were a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition of speech.").

Because, even viewing the facts in the light most favorable to the defendants, we conclude that the trespass notices were unreasonable, we need not and do not reach the question of their viewpoint neutrality.[36] Whether or not the notices were

---

**36.** There are facts in the record that might raise the concern that Huminski was, at least in part, being punished for his political protests, or being prevented from continuing them, by his exclusion from Rutland court-

houses and their premises. The district court concluded that it could not decide, as a matter of law, whether some of the defendants' actions with respect to Huminski were motivated by security concerns or arose out of

viewpoint neutral, they constituted an unreasonable restriction on Huminski's expressive activity in a nonpublic forum.

Our review thus suggests to us that the defendants violated Huminski's First Amendment right of free expression by issuing the trespass notices. The defendants are not entitled to qualified immunity with regard to this claim because this right was clearly established at the time that the defendants issued the trespass notices. Nor are they entitled to qualified immunity on the basis that "it was 'objectively reasonable' for [them] to believe that [their] actions were lawful at the time of the challenged act[s]," *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995) (citations and internal quotation marks omitted), in light of the preceding discussion. Although not on appeal before us, based on the foregoing, we suggest that the district court upon remand reconsider its denial of summary judgment to Huminski for the defendants' violation of his First Amendment right of free expression.

## VI. *Injunctive Relief*

We conclude that the district court abused its discretion in dissolving the preliminary injunction as to all defendants other than Corsones and Zimmerman, whom we have found to be immune currently from injunctive relief under 42 U.S.C. § 1983. Huminski has demonstrated both a likelihood of irreparable injury if the injunction is not granted, *Bronx Household of Faith v. Bd. of Educ. of New York*, 331 F.3d 342, 349–50 (2d Cir.2003) (discussing the presumption of irreparable injury in First Amendment cases), and a likelihood of success on the merits of his action, *see New Kayak Pool Corp. v. R & P Pools, Inc.*, 246 F.3d 183, 185 (2d Cir. 2001). We therefore reinstate the preliminary injunction as to all defendants other than Corsones and Zimmerman, subject to the district court's reconsideration with regard to events occurring subsequent to its decision in *Huminski III*.

We reject Predom's argument that such injunctive relief is unwarranted against her on the ground that the relief is moot given her limited involvement in the issuance of the May 27 Notice and her position that the May 27 Notice superseded or voided the May 24 Notice. Whether or not the May 27 Notice superseded or voided the May 24 Notice, *compare Huminski III*, 211 F.Supp.2d at 531 n. 18 ("There is no support for Predom's suggestion that the initial notice was legally superceded or voided by virtue of the second trespass notice.") *with* Entry Regarding Motion in *Huminski v. Rutland Dist. Court* (Vt.Dist.Ct.1999) (noting that the May 24 Notice had been withdrawn, presumably by operation of the issuance of the May 27 Notice), Predom acted to put the May 24 Notice in effect for at least three days. Injunctive relief as to her is therefore not moot. Predom has not demonstrated "that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the

their disagreement with the views that he wished to express. *Huminski III*, 211 F.Supp.2d at 529–31; *see Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 842, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978) ("[S]peech cannot be punished when the purpose is simply 'to protect the court as a mystical entity or the judges as individuals or as anointed priests set apart from the community and spared the criticism to which in a democracy other public servants are exposed.' " (quoting *Bridges v. California*, 314 U.S. 252, 291–92, 62 S.Ct. 190, 86 L.Ed. 192 (1941) (Frankfurter, J., dissenting))); *cf. Cohen v. California*, 403 U.S. 15, 18, 26, 91 S.Ct. 1780, 29 L.Ed.2d 284 (holding that a state government violates the First Amendment when it criminalizes the defendant's public display on his clothing of a political sentence containing an expletive).

effects of the alleged violation." *Granite State Outdoor Adver., Inc. v. Town of Orange*, 303 F.3d 450, 451 (2d Cir.2002) (per curiam) (citation and internal quotation marks omitted).

We also reject the contention of Sheriff Elrick and the Sheriff's Department that the possibility of their future enforcement actions with respect to Huminski does not render them subject to an injunction. They argue that they cannot be participating in any ongoing violations of Huminski's rights because "[w]hen carried to its logical extreme, Huminski could amend his complaint to ... name *all* law enforcement officers in the State of Vermont since they all have the same duty and responsibility to enforce the judicially sanctioned trespass notice still in effect." Br. for Appellees Sheriff R.J. Elrick and Rutland County Sheriff's Department, at 31 (emphasis in original). We disagree both because it is uncontested that Elrick and the Sheriff's Department have an ongoing involvement in courthouse security in Rutland, and because it is not a prerequisite for relief against Elrick in the context of this case that Huminski seek relief against every other sheriff in Vermont.

Upon remand, the district court should consider whether, under present circumstances, permanent injunctive relief is required and, of course, the terms of any such injunction.

## CONCLUSION

For the foregoing reasons, we conclude that (1) the district court correctly concluded that Sheriff Elrick is entitled to summary judgment with respect to any retrospective relief sought against him in his official capacity under the doctrine of sovereign immunity and that the Sheriff's Department is therefore similarly immune and similarly entitled to summary judgment; (2) to the extent the district court ruled that Elrick was otherwise immune in his official capacity, it erred in granting him summary judgment, because he is not entitled to immunity from prospective relief sought in his official capacity; (3) the district court erred in denying the motion by Judge Corsones and Judge Zimmerman for summary judgment with regard to monetary and injunctive relief in their personal capacities because they are entitled to judicial immunity; (4) construing the facts in the light most favorable to the defendants, the defendants violated Huminski's First Amendment right of access to state courts; (5) the defendants are nonetheless entitled to qualified immunity with regard to Huminski's claim for violation of his right of access, and the district court therefore erred in denying Predom's motion for summary judgment with regard to this claim; (6) the district court erred in holding, after construing the facts most favorably to the defendants, that the trespass notices are not unreasonable in light of Huminski's First Amendment right to express himself; (7) the defendants are not entitled to qualified immunity with regard to Huminski's free-expression claim, and the district court therefore did not err in denying Predom's motion for summary judgment as to this claim; and (8) the district court erred in dissolving the preliminary injunction with regard to the defendants, excepting Corsones and Zimmerman, who are protected from such an injunction by virtue of their judicial immunity under 42 U.S.C. § 1983. We therefore affirm the district court's judgment in part, vacate it in part, and remand for further proceedings consistent with this opinion.